# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **vs.** | § | **Civil Action No. _____** |
| | § | |
| **WILLIAM MARSH RICE UNIVERSITY** | § | |
| **d/b/a RICE UNIVERSITY**, | § | |
| **EMILY GARZA**, as agent for Rice | § | |
| University, and **DONALD OSTDIEK**, | § | |
| as agent for Rice University**,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF JOHN DOE'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Plaintiff John Doe[1] and files this Original Complaint against Defendants William Marsh Rice University d/b/a Rice University, Emily Garza, as agent for Rice University, and Donald Ostdiek, as agent for Rice University, seeking a declaratory judgment and injunctive relief, *inter alia*, for breach of contract and gender discrimination in violation of 20 U.S.C. § 1681, *et seq*. ("Title IX"), and in support of which would respectfully show the honorable Court and Jury as follows:

---

[1] Plaintiff John Doe files with this Original Complaint his Motion to Proceed Under Pseudonym.

# I.
## STATEMENT OF THE CASE

1.     The action now before this Court is primarily based on gender discrimination under Title IX and breach of contract brought on behalf of Plaintiff John Doe (hereinafter, the "Plaintiff" or "John Doe"), a former Freshman student and football player for Rice University.

2.     This case arises out of a consensual sexual relationship between two University students who were briefly dating—John Doe (18 years old at the time) and Jane Roe (21 years old at the time). After John Doe and Jane Roe broke up, Jane Roe complained to Rice University that she, allegedly, contracted herpes as a result of their sexual relationship. As discussed hereinbelow, Rice University ignored substantial exculpatory information during its "investigation," including two striking pieces of evidence directly contradicting Rice University's "conclusions." *First*, another male student testified that Jane Roe gave him herpes before John Doe and Jane Roe began a sexual relationship. *Second*, Jane Roe admitted repeatedly during the investigation that John Doe, in fact, told her that he had herpes before their first sexual experience.

3.     Despite the evidence mentioned above, John was suspended and *de facto* convicted of, essentially, knowingly and maliciously transmitting genital herpes to fellow Junior student, Jane Roe, despite Jane Roe (a) having consensual, unprotected intercourse with John Doe on multiple occasions, and (b) freely acknowledging that John Doe had, in fact, *informed her of his prior contraction of genital herpes while he was in high school*. Shockingly, however, Rice University determined that it was the province of the university to oversee, adjudicate, and pass judgment on all things related to the consensual sexual intimacy of its adult students in favor of a female student and adverse to a male student, based upon gender considerations.

4.     In the face of potentially severe and inflammatory negative publicity and/or an investigation at the hands of the Department of Education, Office of Civil Rights ("OCR"), Rice

University has effectively denied male students their rights to fair and non-discriminatory investigations and adjudications of sexual misconduct and related complaints. As a salient example of such gender discrimination, on July 30, 2019, the Department of Education, Office of Civil Rights (Dallas Office) opened a Title IX investigation into all-female educational programs run by Rice University that *specifically* discriminate against and exclude male students.

5.      Against the backdrop of these investigations, Rice University treated John Doe in a manner inconsistent with Rice University's own policies and procedures, stripping John Doe of his rights to a fair and just investigation and adjudication process and assuming nefarious intentions and negative behavior on the part of John Doe based upon his gender.

6.      Notably, Defendants failed to conduct adequate, reliable, and impartial investigations and/or student misconduct hearings. Ultimately, Defendants inexplicably reached the erroneous conclusion that John Doe had *"failed to adequately notify [Jane Roe] of the fact that she was at risk of contracting HSV-1 from [him] if the two of [them] engaged in unprotected sex,"* despite Jane Roe's admission that John Doe informed her of his condition. Defendant Emily Garza further erroneously determined that John Doe's *"failure to disclose this information to a sexual partner, and then subsequently engage in unprotected sex, was a reckless action from which mental or bodily harm could result to another person,"* in violation of Section II(B)(1)(a) of the Student Code of Conduct.

7.      Defendants came to the above-described conclusions despite the facts that: (a) Jane Roe lied  to Rice University P.D. ("RUPD") about being tested for sexually transmitted infections ("STI") *"every six months"* when, in fact, she had never been tested for herpes prior to December 2017; (b) Jane Roe withheld crucial exculpatory evidence from RUPD by failing to disclose that John Doe had, in fact, informed her that he contracted herpes while in high school; (c) during Jane

Roe's interview with Rice University on March 27, 2018, she testified no less than four times that John Doe did, in fact, inform her that he contracted herpes before they had sexual intercourse; (d) Jane Roe admitted to Defendant Garza that she lied about having further sexual intercourse with John Doe after discovering her herpes infection; and (e) Rice University was provided with testimony from a Rice University student, T.O., who stated that he contracted herpes after having sexual intercourse with Jane Roe prior to John Doe attending Rice University. The University had, but ignored, this information in order to make findings against the Plaintiff based upon his gender.

8. Despite a mountain of evidence showing that John Doe did not intentionally or unintentionally violate *any* Rice University policies, severe interim sanctions were imposed against him, including prohibition from attending classes or participating in football activities; complete removal from campus and dormitory within 24 hours; prohibition from entering any Rice University property or participating in any campus activity without express permission and 24 hours' notice. When John Doe's history professor refused to educate him remotely, per the interim suspension, John Doe was forced to drop the class.

9. Thereafter, John Doe's interim suspension was modified to permit him to enter academic buildings solely to attend classes; permission to access the Fondren Library strictly for the purpose of studying; and continued prohibition from entering the buildings or grounds of all residential colleges and dormitories or participating in football-related activities. On June 21, 2018, following Defendants' determination of John Doe's guilt, John Doe was released from the Rice University football program and he was forced to leave the university. Despite the fact that the adult female student admitted to having knowledge of Plaintiff's condition and admitted to having consensual sex while dating, she was not suspended during the investigation or disciplined at all for making material misrepresentations to the police and Rice University investigators.

10. Defendants indicated a bias against male students when Defendants investigated and adjudicated Jane Roe's allegations against John Doe in a manner and degree materially different than their investigation and adjudication of John Doe's testimony in defense of such allegations. Specific instances of bias included, but were not limited to, Defendants' failures to investigate and/or properly consider:

    a. Jane Roe's testimony that she would keep her herpes diagnosis a *"secret"* and just *"use a condom"* with future sexual partners at Rice University, despite the fact that condoms do not, in fact, prevent the spread of genital herpes—an *intentional* violation of the Student Code of Conduct;

    b. That Jane Roe admitted at least four (4) times during her interview with Rice University that she, in fact, knew that John Doe had herpes before they had sexual intercourse;

    c. Jane Roe's multiple misrepresentations and outright lies to RUPD regarding her knowledge of John Doe's contraction of herpes and the frequency of her STI testing;

    d. The fact that the Harris County District Attorney's Office declined to prosecute John Doe for any violations of law;

    e. Male student T.O.'s testimony that he contracted genital herpes after having sexual intercourse with Jane Roe and prior to John Doe ever attending the university; and

    f. Jane Roe's admitted lies regarding having consensual sexual intercourse with John Doe even after discovering the herpes infection.

11. Furthermore, Defendants held John Doe, as a male student, to an egregiously discriminatory and different standard of conduct than Jane Roe, a female student, by inexplicably

insisting that John Doe somehow violated the Code of Conduct by failing to fully educate himself further regarding sexually transmitted infections and then educate, in detail, all of his sexual partners concerning the treatment and curability, if any, of such known sexually transmitted infections, while at the same time and *oppositely* not expecting and/or requiring Jane Roe, who was several years John Doe's senior, to educate *herself* regarding the treatment and curability, if any, of her sexual partners' sexually transmitted infections of which she was aware.

12.     Essentially, here, Defendants placed the onus of sex education entirely on John Doe and absolved Jane Roe of responsibility for her own sexual health, despite John Doe's honest and full disclosure of his herpes infection before they had consensual sexual intercourse. This alleged "requirement" was made up by Defendants for the purpose of disciplining John Doe and not Jane Roe.

13.     It is noteworthy that Rice University did not find that John Doe withheld any information known to him. Rice University had evidence that John Doe did not, in fact, withhold information from Jane and did, in fact, provide to her what information was known to him. Instead, Rice University determined—with no basis in law or policy—that John Doe had some undefined obligation to conduct research and educate his adult sexual partner about a condition of which she was made aware. This determination is unsupported by any articulable policy or law and is simply a fabricated excuse for blatant gender discrimination.

14.     While John Doe was (a) restricted from classes and nearly all Rice University facilities during the pendency of the disciplinary process, (b) required to seek permission from Dean Ostdiek 24 hours in advance to be on campus, (c) removed from his dormitory within 24 hours, and (d) not allowed to participate in any football activities, *inter alia*, Jane Roe was able to attend classes in person and move around campus without any restrictions. Furthermore, in direct contravention of

the Department of Education's September 2017 *"Q&A on Campus Sexual Misconduct,"* Defendants pressured and intimidated John Doe from discussing the matter with other students and/or taking any actions that would potentially *"affect[] the reporting student in a negative way,"* despite the fact that Jane Roe's very public allegations had already negatively affected John Doe's life in ways heinous and irreparable.

15. Fancying itself the arbiter of sexual relations between consenting adults, Rice University erroneously determined that Plaintiff John Doe violated Section II.B.1.a of the Student Code of Conduct by relying on prejudicial assumptions, fabricating a duty that does not exist in policy or law and intentionally disregarding a veritable mountain of exculpatory evidence.

16. At all times, John Doe was tragically deemed guilty of the hateful allegations made against him while Jane Roe's dubious, inconsistent representations were taken as Biblical truths. John Doe was sequestered like a violent criminal, suspended from Rice University until the Spring 2019 semester (losing both his football scholarship and educational opportunities), and defamed as a flippant purveyor of herpetic infections. This extreme and severe sanction was not warranted in light of the available evidence and the insurmountable procedural misgivings effectuated by Defendants.

17. Defendants Rice University, Emily Garza, and Donald Ostdiek conducted a procedurally flawed investigation and adjudication process, leading to an erroneous outcome and an unduly severe, disproportionate sanction as a result of anti-male discriminatory bias, in violation of Title IX, *inter alia*.

## II.
### PARTIES

18. Plaintiff John Doe is a natural person, citizen of the United States and resident of Plano, Texas. The disclosure of John Doe's identity will cause him irreparable harm, as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"). *See* 20 U.S.C. § 1232(g); 34 C.F.R. Part 99.

19. Defendant William Marsh Rice University d/b/a Rice University is a private university receiving federal funds in Houston, Texas, and may be served with process through its registered agent Richard A. Zansitis at 6100 Main Street, MS 94, Houston, Texas 77005.

20. Upon information and belief, Defendant Emily Garza ("Garza") is a resident of the State of Texas and the Director of Student Judicial Programs at Rice University. At times relevant to this action, Garza was Associate Director of Student Judicial Programs. Garza may be served with process through her place of employment at 6100 Main Street, MS-160, Houston, Texas 77005. Upon information and belief, Garza has been acting under the policies, procedures, and practices of Rice University and, in particular, those policies designed to implement Title IX. Garza is responsible for administering the Rice University Code of Student Conduct.

21. Upon information and belief, Defendant Donald Ostdiek, Ph.D. ("Ostdiek") is a resident of the State of Texas, the former Associate Dean of Undergraduates, and Title IX Coordinator for Rice University in Houston, Texas. Ostdiek may be served with process at 119 Beverly Lane, Bellaire, Texas 77401. On information and belief, Ostdiek was acting under the policies, procedures, and practices of Rice University and, in particular, those policies designed to implement Title IX. Ostdiek was responsible for administering the Rice University Student Code of Conduct.

### III.
### JURISDICTION AND VENUE

22. The action *sub judice* arises out of Rice University's decision to impose disciplinary sanctions, including, but not limited to, discriminatory sequestration, suspension, and expulsion against Plaintiff John Doe in breach of contract and in violation of federal law. Rice University receives federal financial assistance and, therefore, is subject to the dictates of 20 U.S.C. § 1681, *et seq*.

23. The action *sub judice* arises from breach of contract and sex/ gender discrimination in violation of Title IX. Indeed, Rice University made the decision to impose disciplinary sanctions, including, but not limited to, discriminatory sequestration and suspension, against Plaintiff John Doe in violation of his herein-described federal statutory rights and in breach of contract.

24. Accordingly, this Court has jurisdiction over the merits of this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25. The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

26. Venue is proper in the Eastern District of Texas, Sherman Division, pursuant to 28 U.S.C. 1391(b), as a judicial district in which the parties hereto are residents and a substantial part of the events and/or omissions giving rise to the claims herein occurred, including the execution of Plaintiff's *National Letter of Intent* and *Rice University Athletics Grant-In-Aid*.

### IV.
### STATEMENT OF FACTS

27. Following years of criticism for being too lax on campus sexual assault, colleges and universities across the United States began relying on Title IX to crack down on alleged perpetrators. Unfortunately, this crackdown has gone too far, and innocent young men, in

particular, have seen their lives and livelihoods shattered by unsubstantiated and erroneous allegations of sexual misconduct. Chief among these issues is the fact that the accused students are, effectively, presumed guilty until proven innocent. Instead of requiring accusers (*i.e.*, "reporting students") to prove that they were victims of sexual misconduct, it is the *accused students* that are required to prove they, in fact, did not commit a sexual misconduct violation against their accuser. In making this determination, universities and colleges are applying the very lowest standard of proof—*preponderance of the evidence*.

28. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. *"I expect that that can't help but be true,"* said Mr. Dana. *"Colleges and universities are getting very jittery about it."*[2] In fact, in May 2016, the National Association of College and University Attorneys published a research note urging colleges and universities to *"promptly destroy"* documents such as emails, staff notes, notes of hearing participants during a disciplinary hearing, drafts of hearing outcome reports, and other such working papers, all of which *"might actually prove very useful to a plaintiff's lawyer"* in a subsequent lawsuit and could contradict or undermine the single record the institution retains.[3]

29. Colleges and universities throughout the country, including Rice University, no doubt, are fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). On information and belief, Defendant Rice University has taken these exact actions and destroyed records pertaining to the investigation and adjudication of John Doe's case.

---

[2] Tovia Smith, Morning Edition, *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR (Sept. 3, 2014).
[3] R. Craig Wood, et al., *Between a Rock and a Hard Place: A Discussion of Issues that Frequently Arise in Sexual Misconduct-Related Litigation Against Colleges and Universities*, NACUA NOTES (May 18, 2016), *available at* http://counsel.cua.edu/res/docs/titleixlitigation.pdf.

30.     In April 2014, the White House issued a report entitled "Not Alone," which included a warning that if the OCR finds that a Title IX violation has occurred, the *"school risks losing federal funds,"* and that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. The Report further warned that if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding.[4]

31.     On October 19, 2016, the OCR announced that it was opening an investigation into Baylor University's handling of Title IX cases. The investigation was reportedly prompted by a complaint filed by Baylor University's former Title IX Coordinator in September 2016, who resigned a week later amid allegations she made about senior leaders at Baylor University actively preventing full Title IX investigations. The OCR investigation and the resignation of Baylor's Title IX coordinator came over a year after students began to accuse Baylor University of mishandling alleged sexual assault cases.[5]

32.     When the Baylor University scandal broke, media outlets pointed to the fact that the U.S. Department of Education has the ability to terminate federal funds, and that although Baylor University is private school, it receives federal funding via student federal financial aid for tuition.[6] Upon information and belief, the Baylor University scandal and the investigation of Texas A&M University, among literally countless others, created a chilling effect among universities and

---

[4] Nick Visser, *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, HUFFINGTON POST (July 4, 2016) ("The vice president said he'd like to take away federal funding from those universities.").
[5] Marc Tracy, *Baylor Under Federal Investigation Over Possible Title IX Violations*, NEW YORK TIMES (Oct. 20, 2016).
[6] Paula Lavigne & Mark Schlabach, *U.S. Department of Education investigating Baylor Title IX cases*, ESPN.COM (Oct. 19, 2016), http://www.espn.com/college-football/story/_/id/17836024/us-department-education-launch-baylor-probe-title-ix-complaint.

colleges, particularly nearby schools within the state of Texas, like Rice University. Therefore, Rice University was reasonably aware that the circumstances at Baylor and A&M had shone a light on other schools for their handling of sexual assault cases and had the potential to produce negative publicity for Rice University.

33.    As of February 1, 2017, the federal government had active investigations into 306 institutions of higher education and slews of closed investigations, including notable schools such as the University of Cincinnati, the University of Miami (Florida), Berkeley College, Stanford University, Harvard University, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago, Baylor University and Texas A&M University.

34.    In response to pressure from the #MeToo Movement, the various Offices of Civil Rights, the Department of Justice, the Department of Education, the Obama Administration, and explosive sexual misconduct allegations at Michigan State University, among others, educational institutions like Rice University have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases in order to avoid the negative publicity and mainstream media hysteria that could result from appearing "anti-victim."

35.    *The New Yorker* reported on February 1, 2019:

> *Universities reacted with panicked overcompliance: in renewing their attention to the rights of alleged victims of sexual assault, many began to disregard the rights of accused students. In recent years, it has become commonplace to deny accused students access to the complaint, the evidence, the identities of witnesses, or the investigative report, and to forbid them from questioning complainants or witnesses. At many schools, including Middlebury College and the University of Pennsylvania, investigators and adjudicators have been trained to "start by believing" the complainant rather than to start from a position of neutrality. According to K. C. Johnson, a professor at Brooklyn College and an expert on Title IX lawsuits, more than four hundred students*

*accused of sexual misconduct since 2011 have sued their schools under federal or state laws—in many cases, for sex discrimination under Title IX. While many of the lawsuits are still ongoing, nearly half of the students who have sued have won favorable court rulings or have settled with the schools.[7]*

36.     On September 7, 2017, the DOE Office of Civil Rights, headed by Secretary Betsy DeVos, released a *"Q&A on Campus Sexual Misconduct"* that indicated the DOE's intent to issue new rulemaking on the topic of schools' Title IX responsibilities in response to the over-adjudication of sexual misconduct claims on university and college campuses.[8]

37.     On September 22, 2017, Secretary DeVos announced that the 2011 Dear Colleague Letter was officially withdrawn.[9] According to the DOE, the 2011 Dear Colleague Letter *"created a system that lacked basic elements of due process and failed to ensure fundamental fairness."*[10] On August 29, 2018, *The New York Times* reported on an alleged copy of the DOE's new proposed rules, which *"would bolster the rights of students accused of assault, harassment or rape."*[11]

38.     Despite these announcements, Rice University ignored and failed to take heed of clear indications from the Trump Administration and the DOE that the rights of accused individuals were being trampled in the pursuit of political correctness. John Doe was a victim of Rice University's disregard for unequivocal DOE guidance and internal bias against accused males.

---

[7] Jeannie Suk Gersen, *Assessing Betsy Devos's Proposed Rules on Title IX and Sexual Assault*, THE NEW YORKER (Feb. 1, 2019), https://www.newyorker.com/news/our-columnists/assessing-betsy-devos-proposed-rules-on-title-ix-and-sexual-assault.

[8] U.S. Department of Education, Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 2017).

[9] U.S. Department of Education, *Department of Education Issues New Interim Guidance on Campus Sexual Assault* (Sept. 22, 2017), *available at* https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

[10] *Id.*

[11] Erica L. Green, *New U.S. Sexual Misconduct Rules Bolster Rights of Accused and Protect Colleges*, THE NEW YORK TIMES (Aug. 29, 2018), *available at* https://www.nytimes.com/2018/08/29/us/politics/devos-campus-sexual-assault.html.

39.     On November 16, 2018, the DOE released its proposed rules governing investigation and adjudication of campus sexual misconduct allegations.[12] In investigating complaints, schools are required to implement a range of due-process procedures, including a presumption of innocence, the opportunity to present witnesses and evidence, and the right to an adviser or attorney at all phases of the process.

40.     On July 30, 2019, the DOE OCR (Dallas Office) opened a Title IX investigation into all-female educational programs run by Rice University that *specifically* discriminate against and exclude male students. Such investigation is ongoing as of the filing of this Original Complaint.

### A. JOHN DOE COMMITS TO RICE UNIVERSITY

41.     On February 2, 2017, at slightly past 7:00 am, John Doe proudly executed a National Letter of Intent, committing himself to enrollment at Rice University for football, and a Rice University Athletics Grant-in-Aid, which awarded him a 100% Athletics Grant-in-Aid (*i.e.*, a "full ride") for the 2017-2018 academic year. John Doe executed these contracts at his parents' home in Collin County, Texas, with his father, the Rice University Director of Athletics (or designee), and the Rice University Director of Financial Aid (or designee) as co-signatories.

42.     John Doe declined football scholarships at Southern Methodist University, California State University at Fresno, Colorado State University, the United States Naval Academy, Tulane University, and Texas Southern University, *inter alia*, in favor of attending Rice University because of the exceptional quality of education he would receive, the Rice University alumni network, the proximity to his family in Dallas-Fort Worth, and the high probability of starting for the Rice University football team.

---

[12] Press Office, *Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All*, U.S. DEPARTMENT OF EDUCATION (Nov. 16, 2018), https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

### B. JOHN DOE AND JANE ROE BEGIN A RELATIONSHIP

43.     John Doe began his collegiate career as a Freshman at Rice University in August 2017 at the age of 18.

44.     John Doe and Jane Roe met in late-October 2017. At the time, Jane Roe was a Junior and several years John Doe's senior. Jane Roe originally attended Rice University to play on the soccer team, but she was no longer on the team by the Fall 2017 semester.

45.     After a few days, Jane Roe and John Doe's relationship became more intimate, and they had a discussion regarding whether either of them had previously contracted any sexually transmitted infections. During this discussion, John Doe informed Jane Roe that he had contracted Chlamydia from another student at Rice University, that John Doe had sought medical treatment for the infection, and that it was now cleared up. In the spirit of honesty and full disclosure, John Doe also informed Jane Roe that he contracted herpes from a girlfriend while in high school. In response, Jane Roe indicated that it was not a big deal. John Doe never made any representation to Jane Roe that his herpes infection had been cured, as it is not a curable condition. Thereafter, the pair engaged in many instances of consensual, unprotected sexual intercourse.

46.     John Doe and Jane Roe carried on a sexual relationship for approximately one month. During the pendency of the relationship, the pair had frank and open discussions about their total number of sexual partners, and Jane Roe admitted to John Doe that she had engaged in many instances of unprotected sex with other students at Rice University before they met. Jane Roe confided in John Doe that she had a problem with cocaine use, referring to herself as a *"coke head,"* and said that her mother kept close track of her for that reason.

47.     Jane Roe also admitted to John Doe that she continued to engage in a sexual relationship with her ex-girlfriend, B.N., during the time that she was sexually intimate with John Doe. At the

time, though, Jane Roe had a no-contact order in place with B.N. because of a physical altercation that occurred between them some months prior.

48.     Prior to and/or during the time that Jane Roe was sexually involved with John Doe, Jane Roe was also engaged in sexual relations with another football player, C.T.

49.     By early-December 2017, however, Jane Roe became unsatisfied with John Doe's perceived lack of emotional engagement. Accordingly, the pair mutually decided to end the relationship between them.

50.     However, around the middle of December 2017, Jane Roe and John Doe decided to reconnect for consensual sexual intercourse. After they undressed, John Doe noticed that Jane Roe appeared to have multiple sores around her vagina. When John Doe told Jane Roe about the open and obvious sores, she appeared calm and unworried. At that time, Jane Roe showed no great concern regarding the multiple sores on her vagina and/or whether she could, quite obviously, be the carrier of a sexually transmitted infection detrimental to John Doe. Indeed, Jane Roe and John Doe agreed to have protected anal intercourse, instead. Jane Roe and John Doe have not had sexual intercourse since that time.

### C. JANE ROE FABRICATES A "SEXUAL ASSAULT" AND CONFRONTS JOHN DOE WHILE HE IS HOME FOR THE CHRISTMAS HOLIDAY

51.     On or about December 14, 2017, while John Doe was home for the Christmas holiday and spending time with his mother, Jane Roe frantically messaged John Doe on Snapchat, a mobile messaging and social media application. While he was still busy spending time with his mother, John Doe opened his messages from Jane Roe, wherein she accused John Doe of maliciously giving her genital herpes and not telling her that the condition was incurable, despite also admitting that John Doe informed her of the condition before they had sexual intercourse.

52.     In response, John Doe told Jane Roe that he was sorry that she had contracted the condition, but it was never his intention to harm Jane Roe in any way. In fact, he had been honest and informed Jane Roe of the condition before they had sexual intercourse.

53.     On Saturday, December 14, 2017, Jane Roe sent a text message to John Doe stating, in effect, *"I'm going to fuck you over. Guess where I'm at? The Houston P.D."*

### D. JANE ROE FILES A CRIMINAL REPORT WITH THE RICE UNIVERSITY POLICE DEPARTMENT, AND THE HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE SWIFTLY DECLINES TO PRESS CHARGES

54.     On Monday, December 18, 2017, Jane Roe filed an online offense report with the Rice University Police Department against John Doe. Among other things, Jane Roe alleged to the RUPD that John Doe committed assault causing bodily injury when he intentionally transmitted an STI (*i.e.*, herpes) to her with the intent of causing her bodily injury. Thereafter, the RUPD forwarded Jane Roe's offense report to the Harris County District Attorney's Office.

55.     Importantly, however, Jane Roe intentionally withheld exculpatory information from the RUPD and made substantial misrepresentations in an attempt to criminally implicate John Doe.

   a.  *First*, during the investigation of her criminal complaint, Jane Roe represented to the RUPD that she was confident that John Doe, and no other sexual partner, gave her the herpes infection because she regularly tested for STI's *"every six months."* Jane Roe's allegation, however, was belied by her own medical records, which showed that she had literally *never* been tested for herpes prior to the outbreak in December 2017.

   b.  *Second*, Jane Roe intentionally withheld from the RUPD investigators that John Doe, in fact, told her that he contracted herpes in high school before they ever had consensual sexual intercourse.

56.     With this additional information, on February 1, 2018, the Harris County District Attorney's Office declined to pursue any criminal charges against John Doe.

### E. JANE ROE'S REPORT OF SEXUAL MISCONDUCT AND TITLE IX INVESTIGATION

57.     On February 12, 2018, after learning that she failed to have John Doe criminally prosecuted by the Harris County D.A., Jane Roe filed a complaint of sexual assault/ misconduct in a much friendlier forum—*the Rice University Title IX Office.*

58.     On February 14, 2018, Plaintiff John Doe received an email from Defendant Donald Ostdiek in his capacity as Associate Dean of Undergraduates and Title IX Coordinator. In his email, Ostdiek informed John Doe that, effective immediately, he was being suspended from Rice University on an interim basis *"to ensure the safety and wellbeing of members of the University community while the University investigates."* According to Ostdiek, the investigation was in response to *"a report about your behavior toward a student at Rice, [Jane Roe], who has alleged that during otherwise consensual sex you infected her with a sexually transmitted infection, and that you knew—before you had unprotected sex with her—that you had that disease."*

59.     From February 14, 2018, to March 8, 2018, John Doe was prohibited from attending classes; kicked off campus and given 24 hours to remove his belongings from his campus dormitory; prohibited from being on any Rice University property; prohibited from participating in any Rice University activities, including football; and threatened with arrest, prosecution and expulsion for violation of any of the above.

60.     On March 7, 2018, John Doe's interim suspension was modified to allow him to enter academic buildings solely for the purpose of attending classes and access to the Fondren Library for study purposes only. Jane Roe was subjected to no restrictions or suspension during the pendency of the investigation.

61. During the investigation of Jane Roe's claims, Defendants repeatedly refused to communicate with John Doe's legal counsel with regard to the investigation. John Doe was only permitted to view the investigation file in person at the offices of Ostdiek upon request and approval. John Doe was not permitted to make copies of any of the investigation file materials. John Doe was not permitted to cross examine his accuser and/or call relevant witnesses in his defense of the heinous allegations.

62. Shockingly, Defendants entirely declined to consider the testimony of another student, T.O., who alleged that he contracted genital herpes after having sexual intercourse with Jane Roe but before Jane Roe and John Doe ever had sexual intercourse.

63. Ultimately, Defendant Garza's official report and findings, dated April 17, 2018, specifically stated:

> *There are several different places, whether in meetings with me or in a written statement, that [Jane Roe] varies on her recollection of the conversation that took place in her apartment prior to becoming sexually intimate with [John Doe]. Early in the investigation, [Jane Roe] stated that [John Doe] did not mention anything specifically about herpes during that interaction. Other times, she indicated that she remembered [John Doe] vaguely saying something about herpes during [his] time in high school. When I asked her about this directly, she told me that, after some reflection, she does recall [John Doe] mentioning that [he] "had herpes in high school." She told me that her memory was "fuzzy" due to the fact that the conversation happened quite some time ago and she had troubling recalling the exact words used. She told me that while [John Doe] mentioned herpes as it was related to a past incident during high school, she does not recall any other details being communicated.*

64. Shockingly, despite Jane Roe's initial falsehoods and later admissions to Defendants' investigators of her own claim, Defendant Garza determined that John Doe bore extraordinary and undue responsibility for Jane Roe's sexual health, based upon a fabrication that John Doe violated the Student Code of Conduct because:

> *[Jane Roe] does not remember [John Doe] telling her that once someone is diagnosed with herpes, that person has to deal with the repercussions for life, or that person is still a carrier of the disease, whether treatment was received for previous outbreaks or not. She also does not recall [John Doe] disclosing the heightened risk of spreading the disease through unprotected sex. As [Defendant Garza] understand[s] it, [Jane Roe]'s memory of this conversation is generally "fuzzy," and this characterization of the content of the discussion was considered in the analysis of this information.*

65. Defendant Emily Garza erroneously determined that John Doe's *"failure to disclose this information to a sexual partner, and then subsequently engage in unprotected sex, was a reckless action from which mental or bodily harm could result to another person,"* in violation of Section II(B)(1)(a) of the Student Code of Conduct, which reads, in pertinent part:

> ### 1. *University Violations (Class I)*
>
> > a. *Mental or Bodily Harm, Reckless Action or Disregard: Intentionally inflicting or attempting to inflict mental or bodily harm on any person, including on the charged student; taking any reckless action, or showing reckless disregard, from which mental or bodily harm could result to any person, including the charged student.*

66. On April 17, 2018, Defendant Garza sanctioned John Doe with suspension from Rice University until the Spring 2019 semester. Furthermore, Defendant Garza determined that, should John Doe return for the Spring 2019 semester, he would be only be allowed on campus for academic purposes; John Doe may not participate in any college-related activities, or attend any event where alcohol is served or consumed; and this restriction would extend to parties and gatherings both on and off campus, and any Rice-sponsored event where alcohol is consumed. Defendant Garza determined that she would not entertain an application from John Doe to lift these restrictions until June 1, 2019, at the very earliest. During the probationary period, described above, John Doe would be required to attend regular meetings with Henry Cash, a Wellbeing Advisor.

67. On April 19, 2018, Rice University Athletics official released John Doe from the Rice University football program. As a result, John Doe lost football scholarship.

68. On June 16, 2018, Rice University announced the retirement of Donald Ostdiek (Associate Dean of Undergraduates and Title IX Coordinator over Student Judicial Programs ["SJP"]) after it was announced that Student Judicial Programs reporting would be restructured in light of a romantic relationship between Ostdiek and SJP Director Lisa DeLaTorre[13], whose position is now held by Defendant Emily Garza[14].

69. The Defendants' unlawful and discriminatory actions against John Doe have caused substantial, immediate, and continuing damages. Defendants' suspension of John Doe and related release from the football program, have caused John Doe to be denied the benefits of education at his chosen school, egregiously damaged his academic, personal, and professional reputations, and will likely affect his ability to enroll at other institutions of higher education and to pursue a professional football career, as Rice University could disclose the sexual misconduct findings to inquiring institutions.

70. In addition, John Doe has been caused to incur tens of thousands of dollars in tuition and room and board fees at alternative educational institutions, legal fees, and severely diminished professional and career opportunities as a result of being released from the Rice University football program. Because of their unlawful actions, Defendants have further caused John Doe to suffer, *inter alia*, anxiety, severe depression, and suicidal ideations following suspension from Rice University.

---

[13] Andrew Grottkau, *Associate Dean of Undergraduates Don Istdiek Retiring*, THE RICE THRESHER (June 16, 2018), https://www.ricethresher.org/article/2018/06/associate-dean-of-undergraduates-don-ostdiek-retiring.
[14] *Student Judicial Programs Staff*, RICE UNIVERSITY (last accessed Aug. 15, 2019), https://sjp.rice.edu/about/sjp-staff.

**V.**
**CAUSES OF ACTION**

71.     The factual allegations contained in the preceding paragraphs 1 through 70, above, are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

**COUNT I**
**DECLARATORY JUDGMENT**
**(28 U.S.C. § 2201)**

72.     Plaintiff repeats and incorporates all of the allegations contained in this Complaint as if fully set forth herein.

73.     Defendants have committed numerous violations of the parties' contracts, as well as federal and state law.

74.     Plaintiff John Doe's education and future have been severely damaged, and without appropriate redress, the biased investigation and the erroneous, unfair, and discriminatory outcome of the disciplinary process will continue to irreversibly damage Plaintiff's educational career and future employment prospects, with no end in sight.

75.     As a result of the controversy, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at Rice University.

76.     Plaintiff John Doe's interests in the results of the alleged sexual misconduct investigation are significant.

    a.  Continued suspension from Rice University and the football program denies him the benefits of an education and professional development at his chosen school.

    b.  Continued suspension and other sanctions also continue to damage John Doe's academic and professional reputations.

c. Continued suspension and other sanctions are likely to affect the John Doe's ability to enroll at other institutions of higher education and/or to pursue a career.

77. Rice University failed to provide adequate time to engage the advisement of counsel and/or find a suitable faculty advocate, as John Doe was required to entirely remove himself from campus and begin the misconduct investigation process in 24 hours. In particular, John Doe was not adequately advised of the procedures and policies for the investigation process.

78. Defendants Rice University, Ostdiek and Garza were biased against male students, particularly male students accused of sexual misconduct. The entire investigation and adjudication process was specifically geared toward finding against male students in favor of female students regardless of the evidence presented or attempted to be presented.

79. Rice University administrators involved in the adjudicatory and appeal process were biased against male students accused of sexual misconduct, as evidenced by Defendants' failures to interview or investigate the claims of John Doe's witnesses and failures to investigate and properly weigh Jane Roe's numerous factual mischaracterizations and outright lies.

80. Rice University permitted the use of hearsay and contradictory evidence at the hearing without providing John Doe the opportunity to effectively cross-examine or call witnesses. In particular, John Doe was not permitted to cross-examine his accuser and/or call his own witnesses.

81. John Doe was denied the effective assistance of an attorney and/or other advisor. An advisor or representative was permitted to be present for some, but certainly not all, stages of the process, but the advisor/ representative was not permitted to participate.

82. As a result of the foregoing and herein-described acts and/or omissions of the Defendants, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) Rice University's finding of misconduct on the part of Plaintiff be reversed in whole; (ii) Plaintiff's reputation be restored;

(iii) Plaintiff's disciplinary record be expunged; (iv) any record of the investigation and findings at the hearing and/or appeal be destroyed; and (v) Rice University's rules, regulations and guidelines be found discriminatory under Title IX, as applied.

83.    Pursuant to 42 U.S.C. § 1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT II**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**AGAINST ALL DEFENDANTS**

84.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

85.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> *No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.*

86.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds. Rice University is a recipient of federal funds and is subject to the requirements of Title IX.

87.    A school may violate Title IX by failing to prevent or remedy sexual harassment or sexual assault, or by the imposition of university disciplinary measures where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

88.    The DOE promulgated regulations under Title IX that require a school to *"adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by"* Title IX or regulations

thereunder. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

89. The DOE ostensibly recognized that the procedures adopted by a school, such as Defendant Rice University, and covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided *"on the basis of an erroneous or distorted conception of the law or the facts." Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980).

90. The DOE recognizes that there must be *"[a]dequate, reliable, and impartial investigation of complaints"* and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual misconduct.

91. Generally, private challenges to disciplinary proceedings under Title IX manifest themselves as one of four broad theories: (1) plaintiffs claiming an "erroneous outcome" of a disciplinary proceeding; (2) plaintiffs claiming selective enforcement of university procedures to students of different sexes; (3) plaintiffs claiming deliberate indifference to sexual harassment or sexual assault on campus; and (4) plaintiffs claiming a university's actions based on archaic assumptions about the roles or behavior of men and women. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) (recognizing Title IX claims for erroneous outcome and selective enforcement); *Davis v. Monroe County Board of Education*, 526 U.S. 629, 639 (1999) (recognizing liability for deliberate indifference that cause students to suffer harassment or make them vulnerable to harassment); *Pederson v. Louisiana State University*, 213 F.3d 858, 880-82 (5th Cir. 2000) (recognizing classifications based on "archaic assumptions" are facially discriminatory and constitute intentional discrimination in violation of Title IX); *Pacheco v. St.*

*Mary's Univ.*, 2017 WL 2670758, at \*11 (W.D. Tex., June 20, 2017), appeal dismissed, 17-50635, 2017 WL 7036540 (5th Cir., Nov. 3, 2017).

92.     Plaintiff John Doe asserts claims based upon categories (1), (2) and (4); namely, an erroneous outcome of a disciplinary proceeding; selective enforcement of policies and procedures based upon gender; and archaic assumptions about the roles of men and women.

93.     An "erroneous outcome" occurred in this case because John Doe was absolutely innocent of the reckless and/or intentional conduct alleged and wrongly found to have committed sexual assault, and gender bias was a motivating factor.

94.     Furthermore, Defendants were deliberately indifferent to the sex-based harassment that John Doe was forced to endure from Jane Roe when she lodged heinous and false complaints with the Rice University Police Department and, subsequently, Rice University, alleging that John Doe had committed sexual assaulted with intent to cause bodily injury through transmission of herpes. When Jane Roe's false and malicious allegations were forwarded to the Harris County D.A., a swift investigation uncovered the truth of the matter, and the D.A. declined to press any charges. In fact, Defendants' own investigation determined that there was no evidentiary basis for a finding that John Doe violated the Sexual Misconduct Policy related to dating violence.

95.     Defendants were keenly aware of Jane Roe's desire to maliciously prosecute John Doe for alleged sex-based crimes; in fact, Jane Roe's communications with John Doe, which Defendants had, made such intent exceedingly clear. Defendants further understood that Jane Roe's complaint of sex-based violations and dating violence against John Doe came to Defendants at the heels of the Harris County D.A.'s decision to not file any charges against John Doe. Instead of evaluating the totality of the circumstances and investigating the substantial falsehoods and misrepresentations in Jane Roe's allegations against John Doe, Defendants were complicit in Jane

Roe's sex-based harassment of John Doe and jumped head-long into a sham sexual misconduct investigation, suspension, and threats of prosecution.

96.     Defendants, but particularly Ostdeik and Garza, were deliberately indifferent to the sex-based harassment that John Doe endured from Jane Roe, including defamation of his character throughout the Rice University community, causing him to be paranoid on campus and guarded in his social interactions for fear of being prosecuted by Rice University, per Ostdiek's admonitions.

97.     The denial of a fair investigation and adjudication, as well as numerous procedural errors made in this case, resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts. Additionally, the policies were very obviously applied in a discriminatory and/or arbitrary fashion. Indeed, the notion that a male in a consensual relationship somehow has a greater obligation to "research" and understand the consequences of unprotected sexual intercourse than the consenting female is certainly based upon archaic notions of the roles of men and women, as well as an affront to contemporary concepts of gender equality.

98.     Defendant Rice University failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation and hearing into Jane Roe's allegations, including, but not limited to, placing discriminatory and greater weight on a female accuser's testimony, despite such testimony being contradicted at multiple times, and failures to interview persons and experts with relevant knowledge. The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe, as evidenced by the chronic bias exhibited by Garza and others toward John Doe. The investigators and adjudicator were further biased by Garza's initial, erroneous determination that John Doe had engaged in misconduct, despite a lack of evidence and/or witness testimony to support Jane Roe's claims and the opening

of an investigation in that regard. Importantly, Rice University made the decision to open an investigation into sexual misconduct/ dating violence allegations against John Doe despite the Harris County D.A. declining to press any charges because of, at least in part, Jane Roe's misrepresentations and falsehoods regarding her knowledge of John Doe's herpes infection prior to having consensual unprotected sexual intercourse.

99. Rice University's treatment of John Doe's case also indicated that its policies and procedures are inherently biased against male students when it investigated and adjudicated Jane Roe's allegations and testimony in a manner and degree materially different than their investigation and adjudication of John Doe's testimony and evidence in defense. In fact, Rice University: (a) never opened an investigation of and/or disciplined Jane Roe regarding her testimony that she would keep her herpes infection a *"secret"* and simply use a condom in her future sexual encounters with Rice University students (despite the fact that condoms do not stop the spread of herpes); (b) never contacted and/or interviewed student O.T. regarding his testimony that he contracted herpes after having sexual intercourse with Jane Roe but before John Doe and Jane Roe ever had sexual intercourse; and (c) failed to properly weigh the fact that Jane Roe boldly lied about being tested for herpes prior to having sexual intercourse with John Doe, when in reality, Jane Roe had never been tested for herpes until after having sexual intercourse with John Doe in December 2017.

100. Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997). Yet, in this case, Defendant Rice University relied only on the statements made by Jane Roe (despite a mountain of evidence contradicting such testimony), no cross-examination

was available, and no sworn testimony, as requested by John Doe, was permitted to be taken, in violation of due process of law. *John Doe v. University of Cincinnati*, 2016 WL 6996194 (S.D. Ohio, Nov. 30, 2016).

101.    The totality of the circumstances establishes that Defendants acted out of gender bias in reaching the "erroneous outcome." Defendants effectively ignored the findings and conclusions of the Harris County D.A. and failed to place due consideration on the blatant and malicious misrepresentations and contradictions in Jane Roe's testimony. Defendants barred John Doe from fully defending himself in the investigation and adjudication process by, *inter alia*, refusing to communicate with his chosen counsel, refusing to allow cross-examination of Jane Roe, and refusing to obtain the relevant testimony of John Doe's witnesses.

102.    After Jane Roe reported her allegations to the University, days following the Harris County D.A.'s declination, Defendants severely sequestered John Doe off campus, evicted him from his home, separated John Doe from his support system and the football program, and required that he only be present on campus for classes, among other measures. Without due process, Defendants found John Doe guilty of sexual misconduct and imposed on him unduly harsh and unreasonable sanction, despite a serious lack of evidence, contradictory and questionable testimony from the female accuser, and a lack of witness testimony. The Defendants knowingly, deliberately and intentionally engaged in blatant gender discrimination.

103.    The totality of circumstances establishes that Defendant Rice University has demonstrated a  pattern of inherent and systematic gender bias and discrimination against male students, including those accused of sexual misconduct, and as evidenced in the ongoing Title IX investigation into Rice University's discrimination against men in educational programs.

104. Upon information and belief, Rice University has destroyed records and evidence related to the investigation and adjudication of the sexual assault allegations against John Doe.

105. Male respondents in sexual misconduct cases at Rice University are discriminated against solely on the basis of sex, and Rice University's training and methodologies for Title IX investigations are skewed to findings of truth for victims, even where the evidence does not support such contentions. Accused males are invariably found guilty, regardless of the evidence or lack thereof.

106. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, including anxiety, severe depression, and suicidal ideations, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

107. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

**COUNT III**
**STATE LAW BREACH OF CONTRACT**
**AGAINST DEFENDANT RICE UNIVERSITY**

108. John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

109. Defendant Rice University created express and/or implied contracts when John Doe accepted an offer of admission to Defendant Rice University and paid the tuition and fees. Indeed, Texas law recognizes an implied and/or express contract between a private institution of higher learning and its students.

110. Defendant Rice University breached express and/or implied contracts with John Doe.

111. Defendant Rice University's policies provide that students are to have a fair and impartial disciplinary process in which it is the responsibility of Rice University to show that a violation has occurred before any sanctions are imposed. Defendant Rice University breached its contract with John Doe when it failed to conduct a fair and impartial process, as fully described herein. At no time was John Doe afforded the procedural guarantees that generally accompany an investigation and adjudication of sexual misconduct/ dating violence allegations, such as the right to present witnesses, experts and evidence, confront one's accuser, and cross-examine and challenge any witnesses against him, all before an impartial and objective fact-finder. Thus, Defendants violated the contract with John Doe when they failed to afford him a proper hearing on the accusations against him.

112. Though an inadequate standard to protect the procedural rights of accused students, Defendant Rice University utilizes a preponderance of the evidence standard of review, as recognized in its policies. Defendant Rice University violated this provision when it improperly placed the burden of proof on John Doe to prove that the accusations against him were not true and when it failed to utilize the preponderance of the evidence standard, in fact, in reaching the outcome. Defendant Rice University, therefore, breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

113. Based on the aforementioned facts and circumstances, Defendant Rice University breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. Defendant Rice University failed its duty of good faith and fair dealing when it meted out a disproportionate sanction, including expulsion from the Rice University football program

and the withdrawal of John Doe's scholarship, notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct/ dating violence.

114.    John Doe is entitled to recover damages for Defendant Rice University's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

115.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## VI.
### DEMAND FOR TRIAL BY JURY

116.    Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

## VII.
### PRAYER FOR RELIEF

**WHEREFORE**, **FOR THE FOREGOING REASONS**, John Doe demands judgment against Defendants, as follows:

i.    For violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, loss of future career prospects, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

ii.    For state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and  psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

iii.    Such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted.

/s/Susan E. Hutchison
SUSAN E. HUTCHISON
Texas Bar No. 10354100
sehservice@hsjustice.com

J. ROBERT HUDSON, JR.
Texas Bar No. 24094736
jr@hsjustice.com

HUTCHISON & STOY, PLLC
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
T: (817) 820-0100
F: (817) 820-0111

**ATTORNEYS FOR PLAINTIFF**