# United States Court of Appeals
# for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

*June 12, 2023*

Nathan Ochsner, Clerk of Court

No. 21-20555

United States Court of Appeals
Fifth Circuit

**FILED**

May 11, 2023

Lyle W. Cayce
Clerk

JOHN DOE,

*Plaintiff—Appellant,*

*versus*

WILLIAM MARSH RICE UNIVERSITY, *doing business as* RICE UNIVERSITY,

*Defendant—Appellee.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-2985

---

Before STEWART, ELROD, and GRAVES, *Circuit Judges.*

CARL E. STEWART, *Circuit Judge:*

John Doe appeals the district court's summary judgment in favor of William Marsh Rice University d/b/a Rice University (hereinafter, "Rice" or "the University") dismissing his claims under Title IX of the Educational Amendments Act of 1972 ("Title IX") as well as his state law breach-of-contract claims. Because our review of the record reveals that disputed issues of material fact remain as to Doe's Title IX claims, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

No. 21-20555

## I. FACTUAL & PROCEDURAL BACKGROUND

In the Fall of 2017, student-athlete Doe began his freshman year at Rice on a full-ride football scholarship. Shortly thereafter, Doe met Jane Roe, a fellow student at Rice who was in her junior year at the time. Roe and Doe began dating, discussed their sexual histories including that Doe had contracted herpes and chlamydia in high school, and ultimately engaged in several consensual, unprotected sexual encounters before they ended their relationship in early December 2017. Later that month, Roe texted Doe informing him that she thought she had herpes and that she "most likely got it" from him. Doe responded that he "had it a long time ago" after which Roe informed Doe that he likely had "dormant herpes." Doe then asked Roe what "dormant" meant and she explained that herpes was an incurable disease, meaning one "[has] it for life." Doe then apologized to Roe, acknowledging that there was nothing he could say to remedy the situation.

On December 15, 2017, Roe contacted the University's Title IX office and stated that she became infected with herpes after a consensual sexual encounter with another student who knew he had herpes. She sought information about submitting a formal complaint to the University's Student Judicial Programs ("SJP"). Then, on December 18, Roe filed a police report with the Rice University Police Department ("RUPD") alleging that Doe failed to inform her that he had herpes prior to their sexual encounters. The next day, she informed RUPD that she wanted to press criminal charges against Doe, but the department declined to file charges, explaining that the State could not prove Doe's intent to spread herpes to Roe.

After meeting with SJP in January of 2018, Roe submitted a written complaint on February 12, stating that Doe failed to inform her that he had herpes during their relationship. On February 13, SJP Director Emily Garza notified Doe via email that he was prohibited from contacting Roe and

2

No. 21-20555

requested to schedule a meeting the following day, to discuss "a disciplinary matter." The following morning, on February 14, Doe's then-attorney Brett Podolsky called Garza to tell her that Doe would not be attending the meeting. Garza then informed Podolsky that she would only communicate with Doe, so Doe responded to her email seeking to reschedule the meeting so he could prepare and obtain further legal advice. Garza confirmed receipt of Doe's email and replied that someone would get in touch with him soon regarding rescheduling the meeting.

Later that day, Doe received an emailed letter from Dean Donald Ostdiek informing him that he was immediately placed on an interim suspension pursuant to Code section 1.E.1 and 1.E.2 "to ensure the safety and wellbeing of members of the University community while the University investigates." The letter explained that the interim status of the suspension would be reviewed after Doe engaged in the regular investigative process with the University and that he was prohibited from stepping foot on campus for any reason, including to attend classes, without the express permission of Dean Ostdiek or SJP.

Doe also received a letter from Garza informing him of the allegations that had been made against him and that disciplinary charges had been filed. She further stated that SJP was investigating whether Doe had violated the University's Code section II.B.1.a prohibiting "intentionally inflicting or attempting to inflict mental or bodily harm on any person" and "taking reckless disregard, from which mental or bodily harm could result to any person[.]" She also explained that she was investigating whether his conduct "may qualify as dating violence" under the University's Sexual Misconduct Policy. The letter stated that Doe had until February 21, to respond to the charges but SJP later extended his response deadline to March 6.

3

No. 21-20555

On March 6, Doe submitted to SJP his written response to Roe's complaint explaining that he and Roe had discussed prior to beginning their sexual relationship that Doe had been diagnosed with herpes in high school but that he had not had "outbreaks or symptoms" since that time. He suggested that Roe might have contracted herpes from another that had stated he had sexual relations with Doe and had been subsequently diagnosed with herpes. He further alleged that Roe had repeatedly lied and contradicted herself in her representations to SJP.

The following day, on March 7, Doe received an email from Dean Ostdiek modifying the terms of his suspension so that he could attend classes since the "process [was] now continuing with [his] participation." On March 21, another meeting was held between SJP and Doe wherein Doe was permitted to have Poldolsky present as a "support person" and meet with Garza. During this meeting, Doe reiterated that he had previously told Roe in a brief conversation, prior to their sexual relationship, that he had herpes in high school. On April 9, Garza informed Doe and Roe that SJP had completed its investigation and that both had the opportunity to supplement the casefile until April 13.

On April 17, Garza issued a decision letter stating that, based on a preponderance of the evidence standard, "[Doe] failed to adequately notify [Roe] of the fact that she was at risk of contracting HSV-1 from [him] if the two of [them] engaged in unprotected sex[,]" and "[Doe's] failure to clearly disclose this information to a sexual partner, and then subsequently engage in unprotected sex, was a reckless action from which mental or bodily harm could result to another person" in violation of the University's Code. She also noted that although Roe acknowledged that Doe mentioned that he had herpes early in the relationship, Doe never informed her of the details of the disease, the long-term effects, or how it was spread. The letter stated that Doe would be immediately disciplined with "rustication," a sanction that

No. 21-20555

permitted him to be on campus for academics and for other purposes with prior permission. The letter further provided that Doe could request to have his rustication lifted "no sooner than June 1, 2019."

On April 19, 2018, a Rice University Athletics official released Doe from the football program and he lost his football scholarship. On April 23, Doe filed a Notice of Appeal with Dean John Hutchinson contending that Roe gave conflicting testimony during the SJP proceedings, and that no reasonable trier of fact would find her credible or sustain the charges against him. In addition to listing several instances in which Roe "lied, misled, misunderstood, or 'misremembered'" facts, Doe emphasized that the University neglected to hold her responsible for her "reckless personal behavior" and failed to interview another student that stated that he had contracted herpes from Roe prior to Doe attending the University. Doe concluded by alleging that "Garza and others within the SJP were inherently biased in favor of [Roe] in their investigation and deliberation of this matter."

On May 4, Dean Hutchinson issued a decision denying Doe's appeal and sustaining SJP's disciplinary sanction against him. Specifically, he determined that Doe failed to present evidence of bias, that Doe's text messages to Roe established that his conduct constituted "reckless disregard," and that several of Doe's allegations did not address the primary issue investigated which was whether Doe gave "sufficient notice" about his herpes diagnosis. That summer, on July 16, because Doe had lost his football scholarship, he was forced to withdraw from the University.

On September 11, 2019, Doe filed suit in the Eastern District of Texas against the University, Garza, and Dean Ostdiek, alleging that the University violated Title IX by investigating and adjudicating a punishment in a way that was biased against him as a male. In his complaint, he asserted claims of erroneous outcome, selective enforcement, and archaic assumptions. He also

No. 21-20555

brought a state law breach-of-contract action on grounds that he was deprived of various entitlements conferred when he accepted an offer of admission and paid tuition to the University. He sought a declaratory judgment, injunctive relief, damages, and attorney's fees. On May 7, 2020, Garza and Ostdiek were dismissed as defendants, and on August 25, the case was transferred to the Southern District of Texas.

On January 16, 2021, the University moved for summary judgment and on September 16, the district court granted the University's motion and dismissed Doe's suit. Addressing the merits of his Title IX claims, the district court held that Doe failed to raise a genuine issue of material fact. It further held that Doe could not establish a breach of contract because the University's Code expressly disclaimed that it provided or created a contract, and if it did, there was no breach. Doe filed this appeal.

## II. STANDARD OF REVIEW

We conduct a de novo review of a district court's grant of summary judgment. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing FED. R. CIV. P. 56(a)). "We review evidence in the light most favorable to the nonmoving party, but conclusional allegations and unsubstantiated assertions may not be relied on as evidence by the nonmoving party." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). "A panel may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (internal quotation marks omitted).

No. 21-20555

## III. Discussion

On appeal, Doe argues that material issues of fact remain with respect to his Title IX claims. He also argues that the district court failed to view the evidence in the light most favorable to the nonmovant as required at this juncture. We agree and address each of his arguments below.

Consistent with Doe's overarching claims of gender bias against him by the University, our review of the record identifies multiple instances where the University's due process procedures were deficient in terms of its treatment of Doe. For example, before Doe had a reasonable opportunity to present his side of the story with the advice of counsel, he was prohibited from entering campus with only 24-hours' notice. He was then banned from athletics—which effectively nullified his full-ride football scholarship. Rice treated Doe as guilty, and as a threat to the University's community, until he "participated" in the University's (and the police department's) investigation without the advice of counsel.

Additionally, Doe's lawyer was not allowed to participate in the process or view any documents in the disciplinary file in order to counsel Doe. Instead, Doe was assigned a Title IX "resource navigator" who also met with Roe and a police officer to take Roe's statement, indicating a potential conflict of interest. Further, Doe raised credibility issues about Roe, but the University disregarded these credibility concerns, dismissing them as "irrelevant," or otherwise declined to investigate them. Finally, Rice failed to clearly notify Doe of the conduct he would ultimately be sanctioned for. Roe accused Doe of failing to inform her of his herpes diagnosis, and this was the charge Doe defended against. Rice ultimately found that Doe had informed Roe of his herpes diagnosis but sanctioned him anyway for failing to go further by informing Roe of the risks of having sex with a herpes carrier, despite the fact that no such rule appears in Rice's student code.

No. 21-20555

We further conclude that a rational jury could find that Rice's one-sided procedures resulted from anti-male bias. Doe was kicked off campus on 24 hours' notice because of the risk that he might have sex with other students and infect them with herpes. And he was ultimately sanctioned with what amounted to expulsion for failing to inform a sex partner of the potential consequences of having sex with a herpes carrier. Yet when Doe offered the University evidence that Roe was doing precisely the same thing, and Roe expressly informed the University of her intent not to tell future sex partners of her herpes diagnosis, the University did nothing. Instead, the same Dean of Undergraduates who thought Doe posed such a threat to the University community that he needed to be banned from campus would not require Roe to disclose to her sexual partners that she had herpes. We agree that these facts taken together, or in isolation, implicate serious due process concerns and now turn to the merits of Doe's Title IX arguments.

### A. Title IX

"Title IX proscribes gender discrimination in education programs or other activities receiving federal financial assistance." *Pederson v. La. State Univ.*, 213 F.3d 858, 877 (5th Cir. 2000) (citation omitted). The statute is "enforceable through an implied private right of action," and the Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 209–10 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 1268 (2020) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005)). "The University, as a recipient of federal funding, can be held liable for intentional discrimination on the basis of sex or for deliberate indifference to discrimination against or harassment of a student on the basis of sex." *Plummer v. Univ. of Hous.*, 860 F.3d 767, 777 (5th Cir. 2017), *as revised* (June 26, 2017) (citation omitted). Title IX also "bars the imposition of university

8

No. 21-20555

discipline where gender is a motivating factor in the decision." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Courts have superimposed a number of doctrinal tests onto Title IX's language to aid in its application to school disciplinary proceedings. But this circuit has recently joined a growing number of Circuits to recognize that, while sometimes helpful, these tests do not abrogate Title IX's basic analytical framework. Rather, "[a]ll of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (Barrett, J.); *see also Van Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 527 (5th Cir. 2022) (adopting the approach of *Purdue University*). The Tenth Circuit has recently modeled how to apply this standard at summary judgment. *See Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021). "[T]he operative question for summary judgment [is whether] a reasonable jury—presented with the facts alleged—[could] find that sex was a motivating factor in the University's disciplinary decision." *Id.* As we will explain below, Doe has met this burden.

Doe has opted to pursue his claims under three doctrinal tests that recur in higher education Title IX cases—those being the (1) erroneous outcome, (2) selective enforcement, and (3) archaic assumptions theories of liability. We analyze his claims accordingly. At bottom, each demonstrates that a reasonable jury—presented with the evidence in this record—could conclude that sex was a motivating factor in Rice's decision to discipline Doe.

### (1) Erroneous Outcome

To advance an erroneous outcome claim, a student-plaintiff can argue that the disciplinary proceeding came to an erroneous outcome because it was infected with bias. *Doe v. Baum*, 903 F.3d 575, 585–86 (6th Cir. 2018). To prevail on this type of claim, a plaintiff must show (1) an erroneous

outcome and (2) that "gender bias was the motivating force behind" it. *Klocke*, 938 F.3d at 210 (citing *Yusuf*, 35 F.3d at 715). Specifically, "[a] plaintiff alleging an erroneous outcome must point to 'particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,'" and "demonstrate a 'causal connection between the flawed outcome and gender bias.'" *Id.* (quoting *Yusuf*, 35 F.3d at 715).

As to the issue of erroneous outcome, the district court opined in the proceedings below that Doe's text messages alone indicated that "he did not inform or inadequately informed Roe of his herpes status." It further expounded that "Roe's sexual history and knowledge about the risks of having unprotected sex [were] irrelevant and [did] not demonstrate that [Doe's] gender affected the University's investigation or decision regarding the complaint filed against him." According to the district court, "the University's decision was based on unrebutted evidence about their encounter found in the text messages between them and not his gender."

To the contrary, Doe has continuously and strenuously questioned why Garza did not ask Roe "how many other students she had unprotected sex with, did not ask for any names, took no steps to interview any other students, and did not even consider interviewing the other student that [] Roe was sleeping with at the same time she was sleeping with Doe." He also avers that "Roe could have chosen to abstain [from sex with Doe], to get more information, or to require Doe to get tested[,] and Roe did none of those things, yet Garza did not hold Roe accountable at all."

Doe points out that Garza herself acknowledged repeated misrepresentations by Roe during the investigation and that "Roe repeatedly changed her story about," inter alia, "whether Doe told her he had herpes in high school, . . . whether she had sex with Doe after she discovered [her

outbreak], . . . whether she had other sexual partners during the time she was having sex with Doe, and whether she even asked Doe about herpes." He then identifies multiple SJP investigational flaws, including that Garza had "acknowledged that . . . forgiving the female's inconsistencies more easily than the male's would violate the University's gender discrimination policies," and that "if she was biased in favor of the female, it would violate the University's gender discrimination policies."

We agree with Doe that a question of material fact remains as to whether the University reached an erroneous outcome in its SJP proceedings against him. *See Yusuf*, 35 F.3d at 715 (stating that a student-plaintiff can plead a Title IX violation by "alleg[ing] particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"). First, and most significantly, we note that contrary to Roe's allegations and the University's position at the time of Doe's interim suspension, the record supports Doe's contention that he did inform Roe about his history with herpes before the two had sex and that she may have had herpes already. Indeed, by her own admission, Roe knew that Doe had herpes in his sexual history, but she declined to inquire further about the disease or its transmissibility before having unprotected sex with him.[1] Moreover, as Doe urged in the SJP proceedings, Roe could have contracted herpes from one of her other sexual partners prior to beginning her relationship with him, a theory which could have been corroborated by another male student had the University contacted him to confirm Doe's

---

[1] The record contains a letter from Garza to Doe dated April 17, 2018, stating that although "[Roe] told [Garza] that . . . [Doe] mentioned a history with herpes early in the relationship, [Roe] was never informed of the details of the disease, the long-term effects, or how it is spread."

allegations.[2] In other words, the record supports Doe's argument that Roe knew about Doe's herpes, had unprotected sex with him anyway, and may have already had herpes herself at that time.

Nevertheless, Rice kicked Doe off campus on 24 hours' notice because he allegedly did not disclose his herpes diagnosis to Roe even though, as we have stated, the record clearly contradicts this conclusion, and even though it would ultimately immunize Roe for the exact same behavior. Furthermore, Rice ultimately sanctioned Doe with what amounted to expulsion for failing to inform Roe of all of the risks of having sex with a herpes carrier, even though Rice's student code does not contain such a requirement and, again, even though the University would ultimately immunize Roe for doing the same thing. This is further evidenced by Dean Ostdiek's deposition testimony that the University would not require Roe to disclose to her sexual partners that she had herpes as the University was holding Doe liable for failing to do.[3] Likewise, Garza's deposition testimony provided, and the record confirms, that Doe never made any misrepresentations or changed his story while Roe consistently misrepresented the facts and changed her story. For example, Roe told the RUPD that Doe never told her he had herpes prior to their sexual encounters but later admitted that Doe did in fact disclose his herpes diagnosis to her prior to the two having sex. A rational juror could also find the variance between Roe's allegations and the conduct for which Doe was ultimately sanctioned to be explainable by the fact that Roe's allegations fell apart under

---

[2] Garza admits that she did not follow up with Doe's proposed witness, and she did not consider Doe's impeachment of Roe's credibility to be "relevant."

[3] When asked by Doe's counsel whether the SJP would have an obligation to ensure that Roe disclosed her herpes diagnosis to her sexual partners, Dean Ostdiek replied "[t]he SJP would not mandate going forward that she tell all sexual partners. That is something that would be done through counseling in a professional setting."

No. 21-20555

scrutiny. A factfinder would not be unreasonable to conclude, as the Ninth Circuit speculated in *Doe v. Regents of University of California*, that "when confronted by a claim that lacked merit, the University rushed to judgment" by suspending Doe, "and then sought out a way to find the accused responsible for something in order to justify its earlier actions." 23 F.4th 930, 939 n.12 (9th Cir. 2022).

Furthermore, Doe was punished for alleged violations of the University code of conduct's "expectations of civility and respect" but it is unclear on these facts exactly how Doe's failure to describe to Roe how a certain strain of herpes is transmitted violated these "expectations of civility and respect." Roe's behavior, meanwhile, hardly appeared to exemplify "civility and respect," as indicated by her text messages to Doe: "Question: are you aware of how much you f***** up. I don't think you do. But you will, do not worry. You don't f*** w me like that and get away with it." Despite Roe's expletive-laden threats against Doe, there is no indication that she was ever charged with any such violation or that the University took any action against her whatsoever. For these reasons, we conclude that material fact issues remain as to whether the University reached an erroneous outcome in its SJP proceedings against Doe. *Id.*; *see also Regents of Univ. of Cal.*, 23 F.4th at 941 ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding."). The district court's consistent discounting of Doe's arguments and evidence underscores that it did not view the record in the light most favorable to the nonmovant. In short, as to the erroneous outcome issue, it weighed evidence and made credibility determinations that were prohibited by Rule 56. *See* FED. R. CIV. P. 56.

No. 21-20555

*(2) Selective Enforcement*

A student-plaintiff can advance a selective enforcement claim by arguing that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. To succeed on this type of claim, a plaintiff must show that either the punishment or the decision to initiate enforcement proceedings was motivated by gender bias. *Klocke*, 938 F.3d at 213.

On this issue, the district court stated that the record before it did not support Doe's contention that the University selectively enforced its procedures. It pointed out that Roe contacted SJP and filed a formal complaint against Doe but a formal complaint was never filed against Roe. It continued that "[a]lthough the University handbook provide[d] a number of sanctions including suspension and expulsion, [Doe] received social rustication for his violation" and "[n]othing in the record indicate[d] that [Doe] received a harsher punishment because he was a male or that female students receive a lighter punishment." It concluded that Doe had not "presented any statistical or other evidence of gender bias" and on those grounds held that he had failed to present a fact issue on his selective enforcement claim.

With respect to his arguments under the selective enforcement theory, Doe emphasizes that he "informed [] Garza that Roe had done exactly what she was accusing Doe of, except worse[,]" and yet Garza did not investigate further. He explains that "[n]one of the email recipients at Rice discussed whether Roe posed a danger to other students, yet when assessing Doe's punishment, they considered 'every other student that attends Rice University' (and who had not filed complaints)." According to

Doe, "[t]hese are all instances of the [U]niversity's selective enforcement of its policies against Doe but not Roe."

Construing the evidence in a light most favorable to Doe, the nonmovant, we agree that a material fact question exists as to whether the University selectively enforced its policies against him by refusing to treat Roe and Doe equally when Doe alleged—in response to Roe's allegations—that she was guilty of the same conduct of which he was charged: failure to disclose the risk of STD transmission. *See Yusuf*, 35 F.3d at 715 (to prevail on this claim, the plaintiff must show that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender"). If, as Doe alleges, Roe likely had herpes before having sex with him, on the University's reasoning, she should have warned him before they had sex—and she did not. But Garza refused to investigate this possibility despite Doe's telling her about this because she claims they "did not have a report about [Roe]." For these reasons, we agree that a material fact issue remains as to whether the University's proceedings against Doe were motivated by gender bias. *Id.*

### (3) Archaic Assumptions

A student-plaintiff can also argue that the University's action was based on overly broad and archaic assumptions about one sex or the other. *See Pederson*, 213 F.3d at 881 ("Well-established Supreme Court precedent demonstrates that archaic assumptions ... constitute intentional gender discrimination."). To successfully raise an archaic assumptions claim, a plaintiff must show that the University's actions were based on attitudes about gender roles that reflect gender bias. *Id.* at 880–82. Decisions and statements that are predicated on "outdated" and "outmoded" assumptions demonstrate a university's intent to treat one differently because of their gender. *Id.* at 881 (citation omitted).

No. 21-20555

As to this issue, the district court reasoned that "the record [was] devoid of any evidence that indicate[d] that the University placed a different duty on male students to disclose the risks of unprotected sex than it [did] on female students." It continued that Doe failed to point to any statements that the University made to demonstrate that males had a different duty to disclose their herpes status. On these grounds, it held that Doe failed to raise a fact issue to establish his claim under the archaic assumptions theory.

Doe on the other hand contends that "[c]ertainly, assuming that an adult female college junior is incapable of understanding the risks of sexual intercourse without the male educating her is part of" the archaic thinking our case law prohibits. According to Doe, "[r]efusing to acknowledge that Roe had an accountability for her own actions, her own choices[,] and her own conduct is 'remarkably outdated'" and "[s]ubsequently refusing to hold her accountable for the same conduct is outdated, archaic, and outmoded."

We agree with Doe that, to the extent a rational jury could find that the University's policy arose from the view that a more-knowledgeable male (Doe) had a duty to educate an unwitting female (Roe) about the precise risks of herpes transmission, its position rests on an archaic assumption. *See Pederson*, 213 F.3d at 881. Roe, as Garza acknowledged, was a "consenting adult female" who, as the record confirms, was rather sexually knowledgeable. In fact, it appears that Roe was perhaps even more educated about herpes and its transmissibility than Doe as evidenced by their text message exchanges wherein Roe informed Doe that herpes was an incurable disease and his case was likely dormant, to which Doe replied "what does dormant mean[?]" Garza's decision appeared to depend on the view that it was Doe's responsibility to inform Roe of publicly available information that Roe, a capable adult woman, could have ascertained for herself: to wit, "the details of the disease, the long-term effects, [and] how it is spread." A rational juror could conclude that to absolve Roe of responsibility for her own

No. 21-20555

risk-assessments—and to place that burden on her male partner—is to act on archaic assumptions in violation of Title IX. *Id.* For these reasons, we agree that a material fact issue remains as to whether the University acted on archaic assumptions in its investigation against Doe. *Id.*

For the foregoing reasons, we hold that the district court erred in granting summary judgment in favor of the University on grounds that the record clearly indicates that material fact issues remain in dispute as to whether Doe has successfully advanced a Title IX claim against the University.

*B. Breach of Contract*

With respect to Doe's breach-of-contract claim, he argues that an implied contract is formed where a private university agrees to provide an educational opportunity in exchange for a student's agreement to successfully complete the degree requirements, abide by school guidelines, and pay tuition. According to Doe, because Garza testified that the University's policies included not treating students differently on the basis of gender, there is at least a material fact issue with respect to this proposed breach of contract. We are not persuaded.

"In Texas, the construction of a contract presents a question of law" which this court reviews de novo. *Hanover Ins. Co. v. Binnacle Dev., L.L.C.*, 57 F.4th 510, 514 (5th Cir. 2023) (citation omitted). Under Texas state law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Intern., Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (alteration in original) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l*, L.L.C., 51 S.W.3d 345, 351 (Tex. App. 2001). Valid contracts can be express or implied, and "the real difference between

17

No. 21-20555

express contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). Although both express and implied contracts require mutual agreement, "in the case of an implied contract," it "is inferred from the circumstances." *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (citation omitted).

Here, Doe has not alleged any breaches of the University's Code or associated policies. Moreover, as the district court accurately observed in evaluating Doe's breach-of-contract claim, the Code expressly provides that "[t]he procedures used . . . by SJP are not those used in court cases and are not intended to create contractual rights[.]" In the absence of contractual rights and the University's intent to be bound, we hold that it is entitled to summary judgment as a matter of law with respect to Doe's breach-of-contract claim. Accordingly, we affirm the portion of the district court's order dismissing Doe's breach-of-contract claim.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of Doe's breach-of-contract claim but REVERSE its summary judgment in favor of the University with respect to Doe's Title IX claims and REMAND for further proceedings consistent with this opinion.

No. 21-20555

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting:

This case begins and ends with one question: Is there any evidence that could lead a rational jury to conclude the University conducted its investigation and issued its punishment against Doe *because he is a man?* The answer is a resounding no. An examination of John Doe's experience with the University's disciplinary process reveals no evidence of gender discrimination. Because of this, and because the majority reaches the opposite conclusion despite what is required to maintain a Title IX gender discrimination claim, I respectfully dissent.

I.

John Doe began attending William Marsh Rice University in the fall of 2017. He met Jane Roe in October, and they began a relationship. At some point, Doe and Roe discussed their sexual histories. Doe disclosed that he had a "run-in" with herpes in high school and was recovering from chlamydia. According to Doe's statement to the University, this "conversation wasn't deep or graphic, and it was brief." Neither Doe nor Roe recalled, "any further discussion about the disease, the ramifications of a diagnosis, or the risk to a partner when engaging in unprotected sex with a carrier of the disease." Roe remembered that Doe told her that he "would never have sex with [her] if [he] wasn't clean." After this conversation, Doe and Roe had consensual unprotected sex many times over five weeks.

The couple broke up amicably but reconnected two weeks later. On December 13, 2017, the couple was about to have sex when Doe noticed sores on Roe's genitals. The couple decided not to have vaginal sex at that time, and Doe told Roe to get checked out by a medical professional.

The following day Roe was tested for and diagnosed with herpes, HSV-1. She immediately confronted Doe by text message. Roe suggested the sores she had were herpes and that she contracted it from Doe. She then asked for clarification of Doe's herpes status, and mentioned that Doe said

No. 21-20555

he had a "run-in" with herpes in high school, and that if he had herpes, it might be dormant. Doe stated, "I think it's that too, just looks similar." He continued to state, "But yeah I had it a long time ago. And what does dormant mean[.]" The conversation continued with Doe stating that he *knew* that "once [you] have herpes you have it for life" and "it never goes away . . . there's not a cure[.]" Doe also stated he knew he had herpes during his relationship with Roe but did not tell her until she confronted him.

Roe filed several complaints against Doe. The important one here is her complaint to the University's Student Judicial Programs (SJP) on February 12, 2018. In that complaint, Roe reported Doe for failing to inform her about his herpes diagnosis before having unprotected sex with her.

Emily Garza, the Associate Director of SJP, reviewed the complaint and began an investigation on February 13. She first notified Doe of a "disciplinary matter," informed him that he should have no further contact with Roe, and asked to have a meeting with him the following day. Doe asked to reschedule the meeting so he could have time to "get some legal advice and be more prepared." Garza then sent Doe a summary of the disciplinary charges against him pursuant to the University's Code of Student Conduct. Garza stated Doe was charged with violating Section II.B.1.a of the Code of Student Conduct, which prohibits "intentionally inflicting or attempting to inflict mental or bodily harm on any person . . . taking any reckless action, or showing reckless disregard, from which mental or bodily harm could result to any person." At that time, based on the reported conduct, Garza stated she was "also concerned that the alleged behavior may qualify as 'dating violence.'"[1] Garza also informed Doe of how he may respond to the charges, including submitting a written response.

---

[1] The Code of Student Conduct discusses dating violence as follows:

No. 21-20555

That same day, Donald Ostdiek, the Associate Dean of Undergraduates, placed Doe on an interim suspension as a measure "to ensure the safety and wellbeing of members of the University community while the University investigates." Dean Ostdiek was worried about the accusations against Doe but was even more concerned about Doe's initial refusal to cooperate with the University police and SJP investigations. Doe had postponed meeting with Garza and had not followed the usual procedure for investigating the matter. Dean Ostdiek mentioned that the temporary suspension would be reevaluated once Doe participated in the standard investigation process.

On March 6, 2018, Doe provided Garza with his written response to Roe's allegations. Doe stated he informed Roe of his "run in" with herpes in high school.[2] He referred to their text messages in which Doe stated, "[a]nd you did mention to me that you had a run-in senior year maybe?" Doe

---

Dating violence refers to causing physical, psychological or emotional harm, or using threats or actions intended to cause physical, psychological or emotional harm to one's current or former intimate partner, domestic partner, or dating partner. Dating violence is often referred to as violence committed by a person who is or has been in a romantic or intimate relationship with the survivor.

[2] Doe's statement about the discussion was:

[Roe] and I specifically talked about my herpes "run in" when I was in Highschool [sic], just as she said in her statement to the school and in her text messages to me . . . . I was very upfront with her and told her what I knew about the situation. This conversation was at the same time we talked about me having [c]hlamydia.

. . .

I did tell her specifically it was herpes. I told her everything I knew about the situation. I did not tell her about a "break out" because I never had sores or blisters, but as I said, I did tell her I went to the Dr. and tested positive for herpes.

emphasized that he did not have an outbreak of herpes, suggested Roe had herpes before the two had sex, and focused on Roe's alleged sexual history.

The following day, Dean Ostdiek modified Doe's suspension because the University's investigatory process was "now continuing with [Doe's] participation." Dean Ostdiek permitted Doe to attend classes and enter academic buildings and the library to study.

Throughout March 2018, Garza conducted her investigation pursuant to the policy listed in the Code of Student Conduct. This investigation included meeting with Doe and his attorney, who was permitted to attend meetings as Doe's "support person." Doe and his attorney were also permitted to review the "disciplinary file" and were informed whenever new information or documents were added to it. This means that Doe was permitted to read Roe's statements and listen to audio recordings of her interviews with Garza and the SJP. Doe was also permitted to submit additional statements in response to his review of the file.

On April 17, 2018, Garza issued a written decision summarizing her investigation and conclusions. Garza found, by a preponderance of the evidence, that Doe "failed to adequately notify [Roe] of the fact that she was at risk of contracting HSV-1 from [him] if the two of [them] engaged in unprotected sex." Doe's "failure to clearly disclose this information to a sexual partner, and then subsequently engage in unprotected sex, was a reckless action from which mental or bodily harm could result to another person." Garza concluded this conduct violated the Code of Student Conduct. Garza also concluded Doe did not violate the Sexual Misconduct Policy and did not commit "dating violence" as described in the Code.

Garza's decision was premised on her finding that Doe *did* tell Roe that he had a history with herpes. In fact, Garza recognized that Roe had admitted, both in text messages and in interviews, that Doe "mentioned" his run-in with herpes in high school. But even though Doe said he had herpes,

Garza found he "did not elaborate on the effects of that diagnosis or the risks posed to sexual partners as a carrier of the disease." Garza also found Doe failed to inform Roe "of the details of the disease, the long-term effects, or how it spread." Garza stated Doe "failed to adequately notify your sexual partner of the physical risk of contracting herpes from [Doe] through unprotected sex, and that eliminated [Roe's] opportunity to make a fully informed decision about her sexual activity and health." These findings were based on the descriptions of the conversation from both Doe and Roe and the text messages between the two.[3]

Garza's decision resulted in penalties being imposed on Doe, including a punishment known as "rustication," which restricted Doe from being on campus for any reason other than academic purposes without permission from SJP. Garza clarified that her office did not have the authority to determine whether Doe could participate in football, but if the Athletics Department permitted it, he would need to coordinate with SJP for his presence on campus.

Doe appealed Garza's decision to the Dean of Undergraduates, John Hutchinson. Doe raised his concerns about Roe's credibility and maintained that his version of events was "the truth of the matter." For instance, he claimed he never "misrepresented" or "misled" Roe. He relied on Roe's admission that Doe told her about his history with herpes. Doe also raised his concern with Garza's decision to omit Roe's statement that Roe would in the

---

[3] Garza also addressed the conflicting "meaning" behind some of Doe's text messages. Garza stated the text messages showed the face-to-face conversation between Doe and Roe about herpes "was insufficient to reach a clear conclusion or understanding." And although Doe contended that he was largely ignoring Roe and only told Roe what she wanted to hear so that she would leave him alone, Garza stated she found the more credible story to be that Doe was trying to engage with Roe about the issue to the point where he asked Roe to send him photos of her genitals to confirm his suspicions about her potential herpes diagnosis.

No. 21-20555

future withhold her herpes diagnosis and "just use a condom." Finally, Doe raised Roe's sexual relationship with another student who contracted herpes after having sex with Roe and before Doe arrived at the University. Doe stated the investigation was biased in favor of Roe, but did not mention the alleged bias arose because of either of their respective genders.

On May 4, 2018, Dean Hutchinson denied Doe's appeal and sustained Garza's decision. Dean Hutchinson concluded Doe produced no evidence of bias and that Doe's own admissions and statements were enough to demonstrate that Doe acted with reckless disregard. Dean Hutchinson emphasized that Garza's decision was focused on the narrow issue of whether Doe gave sufficient notice and warning to Roe about Doe's own herpes diagnosis. Dean Hutchinson also importantly noted some of Doe's raised points, whether Doe gave Roe herpes and her relationships with other Rice students, were irrelevant to *Doe's own conduct.*

Doe withdrew from the University on July 16, 2018.

Doe later sued the University, Garza, and Dean Ostdiek asserting that the University investigated and punished him based on gender bias in violation of Title IX. He also alleged a breach of contract claim for the University's alleged failure to provide him with certain entitlements as part of his admission to the University.

The University moved for summary judgment. The district court granted the motion and concluded Doe failed to raise a genuine issue of material fact as to whether the University acted with gender bias and whether there was a contract or breach. Doe appealed.

## II.

Title IX provides that: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX broadly encompasses

No. 21-20555

diverse forms of intentional sex discrimination, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005), and Doe is free to characterize his claims however he chooses, but the ultimate question is always whether there is evidence that the University "discriminated against [Doe] on the basis of sex[.]" *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527 (5th Cir. 2022). Still, because Doe relies on three specific theories, "we need not speculate on any other possible theories of Title IX liability." *Plummer v. Univ. of Hous.*, 860 F.3d 767, 778 (5th Cir. 2017), *as revised* (June 26, 2017).

First, Doe alleges an erroneous outcome claim in which he contends that the University's investigation and conclusion were "wrong" and gender bias was a motivating factor behind them. Second, he alleges a selective enforcement claim in which he contends he was punished for the same conduct that women, like Roe, committed although only he was investigated and punished. Third, Doe states the University based its decision on archaic assumptions that only men can educate women about sexually transmitted diseases and the risks of unprotected sex.

Based on his own characterizations or otherwise, there is no evidence that could lead a rational fact finder to conclude the University discriminated against Doe because he was a man. The district court's grant of summary judgment to the University was, therefore, proper.

## A.

Starting with Doe's erroneous outcome theory, Doe has produced no evidence that the University's decision was wrong or that it was based on gender bias. "A plaintiff alleging an erroneous outcome must point to 'particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding'—for instance, 'a motive to lie on the part of a complainant or witnesses, or particularized strengths of the disciplined student's defense.'" *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d

No. 21-20555

Cir. 1994)). "The plaintiff must also demonstrate a 'causal connection between the flawed outcome and gender bias.'" *Id.* (citing *Yusuf*, 35 F.3d at 715).

Doe's main contention is that Roe was not credible because she "repeatedly changed her story about whether Doe told her he had herpes in high school[.]" It is true that Roe was not entirely consistent from her first report and throughout the investigation. Roe started by acknowledging that she asked Doe specifically about chlamydia and then asked generally whether "he had anything." Roe then alleged Doe "led [her] on to believe he was clean." Yet she also stated in her first report that she "believe[d] he mentioned he had [herpes] in high school[,]" and she "remember[ed] him talking about breaking out during [s]enior year of high school with some type of sexually transmitted disease." She still stated Doe "did not mention what [the disease] was, and of course he did not say that he STILL had it." These statements appear to allege Doe did not mention herpes at all.

Nevertheless, in the text messages submitted to SJP, Roe acknowledged that Doe told her he had a "run in" with herpes in high school. In her subsequent statements and interviews with SJP, she again acknowledged that Doe mentioned herpes in some form. In one statement, Roe stated that she remembered Doe mentioning his "run in" with herpes in high school. And in Garza's final decision, she summarized Roe's statements in which Roe acknowledged she remembered Doe mentioning his "run in" with herpes.

Despite Roe's inconsistencies, Doe's story remained the same—Doe contends he told Roe he had herpes in high school. This contention, however, does not show that the University's outcome was wrong. That is because the University's finding was *not* that Doe did not tell Roe about herpes at all—it was that he did not tell Roe *enough* about his herpes diagnosis. And even more

important is the fact that the University made this finding based on Doe's own statements and Roe's statements *that were most favorable to Doe.*

No one, not even the University, disputes that Doe mentioned or said he had herpes in high school.[4] But even if this is true (notably by *Doe's own version of events*), the University found Doe in violation of the Code of Student Conduct because he did not tell Roe enough about his herpes diagnosis before having unprotected sex with her. The University relied on Doe's statements that the conversation with Roe about herpes was "not deep or graphic" and "brief." The University, therefore, found that while Doe did tell Roe he had herpes in high school, he did not tell her that herpes is an incurable sexually transmitted disease, he is a carrier of that disease for life, he can pass the disease to his sexual partners, and the risk of his sexual partners contracting the disease is heightened during unprotected sex. It was Doe's failure to tell Roe these other facts about his "run in" with herpes in high school that led to the finding that he acted with reckless disregard for the physical and emotional welfare of another student in violation of the Code of Student Conduct. Consequently, Doe's erroneous outcome claim is focused on whether this finding and conclusion were wrong.

---

[4] To the extent Doe continues to attack Roe's credibility on this fact, her credibility was not at issue when the University relied on Doe's own statements to sustain its finding. Doe makes no argument as to why his own statements were unreliable. Nor does he argue that the University did not believe his version of events (likely because they did believe his own version of events).

Doe's general attack on Roe's credibility is insufficient to show the University's finding was wrong. For instance, Doe does not say which of Roe's statements were untrue and which statements the University should have believed over others. (This is probably because the University accepted Roe's statements that were most consistent with Doe's statements, *i.e.*, that Doe did tell Roe that he had herpes in high school.) Regardless, because the University relied on Doe's statements and recount, Doe cannot show the outcome was wrong unless he shows *his own* statements were untrue or warranted further investigation. He has done neither. And Roe's credibility has no impact on this.

No. 21-20555

But Doe has not disputed or refuted the finding that he did not tell Roe the additional relevant facts about his herpes diagnosis. Nor has Doe produced any evidence to show that he did inform Roe about these other relevant facts. In fact, Doe only repeatedly contends that he told Roe he had herpes in high school. That fact, however, was found and accepted by the University. And still, that fact alone is not what resulted in the finding that Doe violated the Code of Student Conduct.

The University found Doe did not say anything more about his herpes diagnosis, which he was required to do under the Code of Student Conduct. The nail in the coffin here is that Doe does not contend he *actually did* tell Roe more information about his herpes diagnosis contrary to the University's finding.[5] This case would be quite different had Doe informed Roe that

---

[5] Doe argues he did not know anything more about his herpes diagnosis to disclose that information to Roe. He points to his text message to Roe in which he asked her what "dormant" means. As an initial matter, Doe's ignorance as to the meaning of the word "dormant" is not the same as ignorance that he has herpes for life, even if asymptomatic. But also, Garza explicitly asked Doe to explain the meaning behind his text messages and statements to Roe. Doe in response said, "[m]y understanding, at that time, you have an outbreak, so either oral in your mouth or on your genitalia, that you can pass it. And that you have it for life." Garza further sought clarification and asked whether Doe understood that herpes "is incurable and a carrier of HSV-1 will always be a carrier." Doe confirmed this was his understanding at the time he sent the text messages. Garza acknowledged that Doe stated he "didn't know nearly as much" about herpes but stated this conflicted with Doe's other statements on the issue.

Doe's contention is also belied by the record before the University. Once Roe clarified what dormant means, *i.e.*, "[o]nce u have herpes you have it for life, you know that right[.] It never goes away. Ever there's not a cure [.]" Doe's response was, "[y]eah I do know that." He goes on to suggest he knows more about the disease and states, "I have the first one. I could explain on the phone[.]" So again, Doe's own statements and words support the University's finding that Doe knew he had herpes, knew he had it for life, and knew he could pass it to others. Doe's question regarding the meaning of "dormant" does not create a triable issue on whether that finding was wrong.

To the extent Doe relies on his affidavit submitted to the district court, in which he stated he "did not know at the time that herpes could lie 'dormant' and still be

28

No. 21-20555

although he had herpes in high school, he carries that disease for life, he can pass that disease even when he is asymptomatic, and the risk of passing it to others increases when he has unprotected sex. However, he neither asserts nor maintains that he did.

There is accordingly no "articulable doubt on the accuracy," *Klocke*, 938 F.3d at 210, of the University's finding that Doe did not tell Roe "appropriate, necessary, and timely information" about his herpes diagnosis. As a result, Doe has not raised a triable issue on his erroneous outcome theory. *See Klocke*, 938 F.3d at 210–11 (concluding there was no triable issue on erroneous outcome claim despite some statements expressing reservations about holding student responsible).

## B.

Doe's selective enforcement theory also fails because there is no evidence that similarly situated women were either not investigated or punished in the same way as Doe. A selective enforcement claim requires a showing that, regardless of Doe's culpability, "either punishment or the decision to initiate enforcement proceedings was motivated by gender bias." *Klocke*, 938 F.3d at 213. To make this showing, plaintiffs typically must point to similarly situated comparators who were treated more favorably. *See id.* (deciding a selective enforcement claim based on whether the evidence "permit[ted] the inference that similarly situated female students were treated more favorably than" the plaintiff).

Although Doe contends the University treated Roe differently than him by not punishing her for the same conduct, the record shows Roe was

---

contagious," that affidavit was not before the University and is not relevant to assessing his claims against it. *See Klocke*, 938 F.3d at 210 (stating doubt on the accuracy of proceeding must be based "on the record before the disciplinary tribunal" (quoting *Yusuf*, 35 F.3d at 715)).

not similarly situated to Doe, and any differential treatment was not based on gender.

Start with the obvious—a formal SJP complaint was filed against Doe and not against Roe. That is a significant distinction showing Doe and Roe were not similarly situated yet treated differently. Although Doe informed Garza that he believed Roe gave herpes to another student before he had sex with her, no formal complaint, by either Doe or the other student, was ever filed against Roe. The University was under no obligation to investigate Roe's behavior, particularly with other students, when no student had submitted a complaint about her. *See Overdam*, 43 F.4th at 528 (discussing the difference between two students where one was accused of violating policies and the other was not). Although Doe stated the other student was willing to "talk" to SJP, that student did not formally file a complaint against Roe, nor did Doe. Also, Garza encouraged Doe to review the Code, which describes the procedures for filing and investigating formal SJP complaints. So, while Roe's conduct was still irrelevant to Doe's own culpability,[6] he still

---

[6] Doe raised the other student in his response to Roe's SJP complaint, apparently because he thought this fact exonerated him from violating the Code of Student Conduct. And while Garza did not address Doe's allegation in reaching her decision about Doe's conduct (which Doe takes issue with), it is clear that his allegation about Roe's conduct with another student was irrelevant as to whether *Doe* did or did not violate the Code of Student Conduct. Dean Hutchinson made that point clear in his decision letter stating, "any activity between [Roe] and [another student] has no bearing on whether *you* acted with reckless disregard." Still Doe provides no rational reason why Roe's conduct with others had any impact on whether his conduct violated the Code of Student Conduct. His argument on this point, at best, suggests he is less culpable because Roe may have had herpes before he had sex with her. But to be clear, the likability or sympathetic view of a victim is not at issue when determining whether Doe violated the Code of Student Conduct. And more importantly, Doe was not charged with giving Roe herpes. He was charged with failing to adequately inform her about his own herpes diagnosis and the risk of passing it through unprotected sex (regardless of whether she already had it).

No. 21-20555

failed to file a separate complaint against Roe after the fact or to pass along this information to the other student who was allegedly harmed by Roe.

The lack of a formal complaint against Roe shows she is not similarly situated to Doe. The University's alleged failure to open up an investigation against Roe or to punish her for allegedly engaging in the same conduct as Doe is therefore not reasonably attributable to gender bias. Instead, it is attributable to the fact that "[Roe] was not accused of violating the University's policies—only [Doe] was." *Overdam*, 43 F.4th at 528; *see also Klocke*, 938 F.3d at 213 (rejecting selective enforcement theory when the accused's proffered comparators were not in a sufficiently similar class with the accused).

Doe next argues that Roe admitted she did not intend to disclose her herpes diagnosis to her future sexual partners, and SJP failed to punish her for the same conduct he was charged with. This again does not show that Roe is similarly situated. Roe's alleged intent to violate the Code *at some time in the future* is still not a violation of the Code that warranted investigation and punishment in the context of investigating Doe's conduct. No student filed a complaint against Roe for this conduct—and at that point in time, it was entirely hypothetical. Is the University expected to punish a student for prohibited conduct the student has yet to engage in?

And when Doe raised this issue in his appeal, Dean Hutchinson acknowledged that Roe would be appropriately investigated and punished *if* she violated the Code with the same conduct in the future. He explicitly stated, Roe "would face her own consequences were that situation to arise."[7]

---

[7] Dean Hutchinson also appropriately pointed out that Doe's concern with Roe's alleged intent to withhold her herpes diagnosis from future partners was "not only irrelevant but wildly off point. Whether [Roe] were at some time in the future to demonstrate reckless disregard for the welfare of another student does not have anything to do with whether it was acceptable for you to disregard the welfare of another student."

No. 21-20555

Rather than showing bias, this statement shows that the University would treat Roe, or any other female student, in the same manner as Doe, if and when they engage in the same reckless conduct as Doe.

Doe argues Roe's statement shows she is a danger to the University community and she should have been punished. This point is irrelevant because Doe was not determined to be a danger to the community simply because *he had herpes*. Nor could Roe. Doe was found to be a danger to the community because he had herpes, *and* he failed to disclose the serious implications of that diagnosis before he had unprotected sex with another student. Roe had yet to engage in this same conduct to make her a similar danger to the community. And at best, her statement showed only that she wanted to maintain her privacy as she went forward with her new herpes diagnosis.

Next, Doe's argument based on Dean Ostdiek's deposition testimony in which he said he would "counsel" Roe rather than punish her, is entirely out of context—and more importantly does not reveal selective enforcement. In response to whether SJP would be required to "act on that information," *i.e.*, the information about Roe's alleged intentions to withhold her herpes diagnosis from future partners,[8] Dean Ostdiek stated he would "have had discussions . . . about whether [Roe] was being counseled." He then stated he would want Roe to receive counseling "[b]ecause this is a very troubling time with a lot of life-changing decisions she has to make."

---

[8] Doe submitted a transcript of Dean Ostdiek's deposition testimony, but it is notably incomplete and does not include the line of questioning before this question to provide context on what "that information" is. It is noteworthy that Doe places great emphasis on this testimony, but it is intriguing that the district court and now us on appeal do not have access to the relevant context. Nevertheless, it seems that the pertinent inquiry pertains to Roe's purported intentions, as they were brought up in the same way as in this case, which was during SJP's investigation of Doe.

No. 21-20555

While Doe thinks this statement reveals Dean Ostdiek's intent to treat Roe differently, when considered in the accurate context of SJP discovering this information in the investigation of Doe's conduct, this statement only reveals Dean Ostdiek's understanding that Roe had just *recently* been diagnosed with herpes. Dean Ostdiek's statement is regarding Roe's status as a reporting student and victim who now needs to understand how to move forward with her diagnosis. And again, there is no evidence that Dean Ostdiek stated he would only counsel Roe in response to a *formal complaint* filed against Roe. In fact, Doe conveniently overlooks Dean Ostdiek explicitly stating the opposite; he said if students made an allegation to the University that Roe "slept with other students and did not tell them that she had herpes," "that would be investigated and assessed." Doe, however, points to no formal complaint lodged against Roe for this conduct.

Dean Ostdiek's statement does not show that he would treat Roe differently if a student filed a formal complaint against her for the same conduct. Nor does it show that Doe, himself, was treated differently because he is a man. And a single out-of-context statement from one University official, who did not adjudicate Doe's charges or his appeal, is simply not enough to demonstrate bias in this case. *Cf. Walsh v. Hodge*, 975 F.3d 475, 484 (5th Cir. 2020) (concluding allegation that one of many people involved in disciplinary process was biased was insufficient to sustain a procedural due process claim based on bias).

The bottom line is that Doe has failed to meet his burden to produce evidence that shows the University selectively enforced the Code. Doe has produced no evidence of similarly situated comparators to even remotely draw an inference that he was treated any differently than any other student, female or otherwise. And to the extent he relies on Roe being a comparator, he has not shown that she was similarly situated to him because a formal SJP

33

No. 21-20555

complaint was never filed against her. Doe's claim based on the selective enforcement theory thus fails.

## C.

Doe's final theory of gender bias, based on the archaic assumptions theory, fails because there is no evidence of archaic assumptions regarding men and women and their respective abilities to understand sexually transmitted diseases and the risks of unprotected sex. In *Pederson v. Louisiana State University*, this court stated, "outdated attitudes about [gender] amply demonstrate [an] intention to discriminate" in violation of Title IX. 213 F.3d 858, 881 (5th Cir. 2000). The court emphasized that intentional gender discrimination can be established by "archaic assumptions," "overbroad generalizations," and "outdated" beliefs "about the different talents, capacities, or preferences of males and females." *Id.* (citations omitted). In *Pederson*, the archaic assumptions were facially discriminatory, and the application of those assumptions, therefore, amounted to intentional gender discrimination.

The record in *Pederson* was rife with university officials' condescending and unfounded comments about women and their athletic abilities. *See Pederson*, 213 F.3d at 881 (listing comments about women including "honey," "sweetie," "cutie," a statement calling softball a "more feminine sport," and a justification to treat women differently because "the women might get hurt"). There was also evidence of blatantly differential treatment of the genders, with female sports having smaller budgets and less qualified staff. *See id.* Here, by contrast, Doe points to no facially discriminatory comments made by Garza or any other University official. In fact, there are no facially discriminatory comments or assumptions in the record *at all*. Moreover, as discussed, Doe has not produced evidence of differential treatment of similarly situated female comparators.

34

No. 21-20555

Although it is possible, as Doe contends, that "assuming that an adult female college junior is incapable of understanding the risks of sexual intercourse without the male educating her is part of [impermissible] archaic thinking[,]" there is no evidence that occurred here. Rather, the record shows the University placed a burden on Doe to adequately inform any and all of his sexual partners about his herpes diagnosis, regardless of their genders, because he is the "carrier of the infection," regardless of his gender. Other than referring to Doe and Roe by their respective male and female pronouns, there is no other discussion or commentary regarding genders, let alone the capabilities of one gender compared to the other.

Doe also argues that the University failed to put any responsibility on Roe for her own knowledge, choices, and conduct in engaging in unprotected sex. But he fails to acknowledge that the entire point of the charges against him was that he did not provide Roe with sufficient information to allow her to "make a fully informed decision about her sexual activity and health."

It is also worth noting that Doe has not identified "outdated" or "archaic" assumptions about the genders and their respective knowledge of sexual health that have somehow found their way into the University disciplinary process. To make his point on this issue, he relies on a single paragraph filled with conclusory and unsubstantiated allegations that the University assumed Roe could not understand the risks associated with herpes because she is a woman. Those allegations are contradicted by the record. The fact that Doe is unhappy that the University placed a burden on him because he is the carrier of a sexually transmitted disease is no evidence that that burden was instead placed on him because he is a man.

Because there is no basis for finding the University based its decision on archaic and outdated assumptions, Doe's claim on this theory cannot survive summary judgment.

No. 21-20555

### D.

Despite Doe's attempts to prove gender discrimination under the three theories above, the ultimate question is: Does the evidence "raise a plausible inference that [the University] or its administrators discriminated against [Doe] on the basis of sex?" *Overdam*, 43 F.4th at 527 (recognizing different fact patterns may show sex discrimination). It does not.

Doe has not identified evidence that gender bias affected Garza's investigation and conclusion. Nor has he shown that the provision he was charged with, Section II.B.1.a, was selected and enforced because of gender bias. To show bias and discrimination, Doe argues Garza more easily forgave Roe's inconsistencies and made assumptions in Roe's favor. Specifically, Doe argues Garza assumed Doe had "some level of knowledge about herpes . . . which there was no evidence."

But a review of the record reveals no evidence of gender bias. The record does not show that Garza only believed Roe or forgave her inconsistencies while disregarding Doe's own statements. In fact, the opposite is true.

Garza assessed Roe's statement thoroughly, and she sought clarification on Roe's allegations. Garza also asked Roe directly whether she remembered that Doe mentioned having herpes in high school. Roe was able to review Doe's response and statements, which were critical of Roe's allegations. Garza summarized all of Roe's inconsistencies and her explanations. Garza's written decision discussed these inconsistencies and stated she considered them when deciding what actually happened between Doe and Roe. Rather than showing a rubber stamp approval and acceptance of everything Roe said, the record shows Garza thoroughly scrutinized Roe's allegations in the investigation.

The same is true for Doe's statements. Garza acknowledged that Doe stated he told Roe about his herpes diagnosis. But she also considered Doe's

messages to Roe (before any SJP involvement) that suggest Doe "admitt[ed] to having unprotected sex with [Roe] while knowing that [he is] a carrier of an incurable sexually transmitted disease that can be transferred to [his] partner by unprotected sex, and failing to disclose that information to her." Despite having both Doe's statements to SJP and his text messages, Garza sought further clarification of Doe's intent and knowledge. She asked Doe to elaborate on what he meant in his text messages and to provide context. In response, Doe verified his understanding and intentions, which did not meaningfully differ from the plain meaning of his messages. This shows, again, that Garza engaged in a thorough investigation to understand Doe's side of the story. And importantly, there is no evidence that Garza simply disregarded Doe's statements for any reason, let alone because he is a man.

Insofar as Doe contends Garza assumed Doe had knowledge about herpes without evidentiary support, he fails to account for his own statements to Garza. She specifically asked Doe about his understanding of herpes. Doe told Garza that he understood herpes was incurable, that he carried it for life, and that he could "pass it." Not to mention there is circumstantial evidence of Doe's knowledge of herpes and its effects based on the fact that he went to the doctor and "tested positive for herpes." Doe's bare allegation that there is no evidence to support his knowledge of herpes is obviously wrong.

It is also relevant that the University gave a nondiscriminatory reason for concluding Doe knew about his herpes diagnosis and the relevant effects and risks to others. That is because, of course, Doe *has herpes*. Dean Hutchinson specifically noted that Doe had the burden to inform his potential sexual partners about his herpes diagnosis and the effects because he was "the carrier of the infection." This is a reasonable, justifiable, and nondiscriminatory basis for the University's decision. Therefore, any

No. 21-20555

"inference of gender bias in these circumstances would necessarily be speculative." *Klocke*, 938 F.3d at 212.

The University and Code of Student Conduct place a burden on carriers of a sexually transmitted disease to inform sexual partners of that disease, the effects of that disease, whether and how the disease can be passed to others, and whether certain precautions or choices affect the ability of the disease to be passed. In that same vein, the University does not expect students who have not been diagnosed with a sexually transmitted disease to understand these facts about every disease. Hence, if a potential sexual partner mentions having chlamydia or "herpes in high school," it may not be adequate information for students to make informed choices regarding their sexual health and behavior. That is a reasonable and justifiable basis for the University's conclusion that Doe acted with reckless disregard for Roe's health. And that conclusion has nothing to do with gender.

Doe appears to think this policy is unfair and unwise. He attributes its unfairness to gender bias, and so does the majority. It may well be a less onerous burden on Doe, or a better policy, to assume every student *should know* or that Roe *should have known* the risks of having unprotected sex after a potential sexual partner reveals he or she "had herpes in high school." It may also be reasonable to require students to inquire into the details of any disclosed sexually transmitted disease. But it is not our place to determine whether the University's policies or the Code of Student Conduct are wise. Our job is to determine whether the policy was either motivated by gender bias or enforced in a manner that discriminates on the basis of gender in violation of Title IX. Doe has overwhelmingly failed to show gender discrimination here. And it is simply insufficient to allege the policy is unfavorable to Doe when there is no evidence that the policy was adopted or is applied to discriminate on the basis of gender.

No. 21-20555

E.

Despite there being no evidence of gender discrimination, the majority takes the position that the disciplinary process itself was unfair to Doe and his Title IX claims somehow survive summary judgment on that basis. The majority raises its concerns with due process and procedural irregularities. But Doe has not alleged a due process claim. So, to address *this appeal*, in which Doe appeals the grant of summary judgment to the University solely on a Title IX claim, the only issue is whether Doe has produced evidence to maintain his Title IX gender discrimination claim.

Doe does not contend he did not receive due process. He contends the process he received was biased because of his gender in violation of Title IX.[9] While the majority may have concerns with the process Doe received,[10] those

---

[9] Most notably, Doe's opening and reply brief do not mention "due process" once. Neither does his briefing on the motion for summary judgment in the district court. Although Doe's complaint mentions due process in passing, he does not raise and has not raised due process arguments against the University. Any argument based on a constitutional right to due process is therefore forfeited. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal." (citation omitted)).

I also note that the University is a private institution. Doe has made no argument that the University is an arm of the state or governmental entity and must comply with constitutional due process. *See Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020) (stating procedural due process confines governmental decisions that deprive individuals of life, liberty, or property interests). Despite this, this circuit has yet to recognize that in university disciplinary proceedings, the accused must be given the opportunity to question the accuser or other witnesses as part of their right to procedural due process. *See id.* at 485; *Plummer*, 860 F.3d at 775 (declining to state "whether confrontation and cross-examination would ever be constitutionally required in student disciplinary proceedings").

[10] The majority takes issue with the fact that Garza did not permit Doe to be represented by an attorney, did not give Doe a hearing, and did not allow Doe to cross-examine Roe. All of these actions were taken, however, consistent with and pursuant to the Code of Student Conduct's description of the relevant process for SJP investigations. The record, therefore, shows Doe was provided with the exact process described in the Code

No. 21-20555

concerns are only relevant here if they arose from gender bias. But, as explained, that is not the case.

This appeal does not present the vehicle to address those concerns. Instead, we are bound by the claim Doe raised and the elements necessary for him to survive summary judgment. That claim, that the University discriminated against him on the basis of his gender, must therefore fail because there is no evidence to sustain it.

### III.

This case is a straightforward Title IX gender discrimination case. To survive summary judgment, Doe is required to produce some evidence that can lead a rational fact finder to conclude the University treated Doe differently because he is a man. The record demonstrates, however, that the

---

(which is neutral regarding gender). And there is no evidence that the University's subscription to the Code's process in Doe's case was motivated by gender bias. Doe completely fails to present evidence regarding the University's process and its application to *any other formally-charged student*, male or female.

As for the merits of these issues, there is little to be concerned about. First, although the University does not formally allow lawyers to represent or communicate on behalf of students in SJP investigations, Doe's attorney was permitted to be by Doe's side through the entire process. Doe's attorney was able to review the charges, assist Doe in drafting his response, advise Doe on what to present to SJP, assist Doe in preparing for his interviews with Garza, and be present at those interviews with Garza. He was also permitted to "pass notes" to Doe during the interviews and to talk to Doe during breaks. Second, Doe has not requested a hearing, nor does he point to any specific requirement that a hearing be provided in these circumstances. Regardless, Doe was permitted to respond to the charges, review the evidence in the file, and submit his own evidence and statements to undermine Roe's theory. Third, the University has made clear that it did not rely on Roe's testimony to conclude Doe's violation. Because Doe's own statements were "sufficient to sustain the University's findings and sanctions[,]" there is little concern with his inability to cross-examine Roe. *Plummer*, 860 F.3d at 775. As a result, there is "no procedural deficiency" in this regard. *Id.* at 775–76 (noting reliance on evidence other than complainant's testimony shows cross-examination of complainant would have had little impact on proceedings); *Walsh*, 975 F.3d at 487 (stating cross-examination in some form might be constitutionally required "where the outcome depends on credibility").

No. 21-20555

University provided Doe with all the procedural protections listed in the Code of Student Conduct and treated him in the same manner as other students regardless of gender. The record is devoid of any evidence, and Doe points to none, that shows the University acted based on gender bias or sex discrimination. I would accordingly affirm the district court's well-reasoned order granting the University's motion for summary judgment.

I respectfully dissent.